KATHERINE G., a minor By and Through her guardian ad litem, CYNTHIA G., Plaintiff and Counter-defendant,

v.

KENTFIELD SCHOOL DISTRICT, et al., Defendants and counterclaimants.

No. C 01–1344 SBA.

United States District Court, N.D. California.

April 7, 2003.

Varma & Clancy, Attorneys at Law, Bob N. Varma, Esq., Sacramento, CA, for Plaintiff.

Law Firm of Lozano Smith, Jan E. Tomsky, San Rafael, CA, for Defendants, Kentfield School District and Marin County Office of Education.

## ORDER ADJUDICATING PARTIES' MOTIONS AND CROSS–MOTIONS FOR SUMMARY JUDGMENT

ARMSTRONG, District Judge.

Plaintiff Katherine G. ("Plaintiff" or "Katherine"), by and through her guardian ad litem, Cynthia G., brings the instant action pursuant to the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. § 1400 *et seq.*, against the Kentfield School District and the Marin County Office of Education (collectively, "Defendants" or the "District"), seeking review of portions of a special education administrative hearing decision. The District has filed a counterclaim against Katherine also pursuant to the IDEA, seeking review of different portions of the decision.

The parties are presently before the Court on Plaintiff's Motion for Summary Judgment ("Plaintiff's Motion") and Defendants' Cross-motion for Summary Judgment on Plaintiff's Claim ("Defendants' Cross-motion"), which relate to Katherine's claim against the District, and on Defendants' Motion for Summary Judgment on Their Counterclaim ("Defendants' Motion") and Plaintiff's Cross-motion for Summary Judgment ("Plaintiff's Cross-motion"), which relate to the District's counterclaim against Katherine.[1] Having

1. Defendants have also filed two sets of objections to evidence and a request for judicial notice.

read and considered the papers submitted and being fully informed, the Court DENIES Plaintiff's Motion and GRANTS the District's Cross-motion, and DENIES the District's Motion and GRANTS Plaintiff's Cross-motion.[2]

## BACKGROUND

### A. Factual Summary

Katherine is a minor child who resides in the Kentfield School District, which lies in Marin County, California. In or around 1998, Katherine, who was then three years old, was diagnosed with language disorder. At her initial Individualized Education Plan ("IEP") meeting on June 19, 1998, the IEP team found Katherine eligible for special education services under the IDEA. In September 1998, Katherine was placed in a special day pre-school class (the "SDC") taught by Clara Yourman, a credentialed special day class teacher and certified speech and language pathologist, at Marindale. Katherine attended Ms. Yourman's class for five hours per day (8:00 a.m. to 1:00 p.m.), four days per week (Tuesday through Friday), during the entire 1998–1999 school year, as well as the 1999–2000 school year.

In March 1999, in preparation for the upcoming annual IEP meeting, Ms. Yourman administered several tests to Katherine to assess her in the areas of receptive and expressive language "to determine her current functioning, goals and placement." The IEP team subsequently convened in May 1999. At the meeting, the team reviewed Ms. Yourman's speech and language assessment and Katherine's goals and objectives, as written in the IEP. The team recommended that Katherine remain in Ms. Yourman's SDC for the remainder of the 1999–2000 school year, a continuation of Katherine's previous goals and objectives (none of which had been achieved), direct occupational therapy one time each week, and a 19–day extended school year program in Ms. Yourman's SDC for the communicatively handicapped.[3] In August 1999, Katherine's parents contracted with Dr. Ilene Lee, a psychologist in private practice, to provide behavioral consultation services for the family.

In September 1999, Katherine began attending the "after-school" program at ABC Academy ("ABC") three days each week for a total of 12 to 15 hours each week during the 1999–2000 school year. ABC was a private preschool located outside Kentfield that served children from preschool through the second grade. Katherine was enrolled at ABC Academy for "day care" purposes and to provide her with opportunities to interact with nondisabled, same-age peers. Katherine's "after-school" program included nondisabled preschool-age children. Katherine also went on to attend ABC's summer school program, taught by Jamaica Stevens, for six weeks (between three and four days each week for a total of 12 to 15 hours each week) during the summer of 2000.

In September 1999, Katherine's parents contacted Paula Cline from Kentfield School District ("Kentfield") and inquired whether Kentfield would provide transpor-

---

2. Even though the IDEA allows for an evidentiary hearing at the request of a party as part of the Court's review of a state administrative decision, see 20 U.S.C. § 1415(i)(2)(B)(ii), neither party has requested such a hearing. The Court has determined that neither an evidentiary hearing nor oral argument will assist its resolution of the instant motions and claims. Accordingly, the Court resolves these matters

without a hearing, evidentiary or otherwise. See Fed.R.Civ.P. 78.

3. "Extended school year programming is educational programming which extends instruction beyond the conventional school year to prevent serious regression over the summer months." Hoeft v. Tucson Unified Sch. Dist., 967 F.2d 1298, 1301 (9th Cir.1992).

tation from Marindale to ABC. Their request was denied.

Beginning in either February or March 2000, Katherine's parents sought private speech and language therapy services at the recommendation of Dr. Lee. Two different speech and language pathologists, Janet Rizzi and, then, Teri–Lyn Cousley, provided a number of therapy sessions for Katherine.

In the spring of 2000, Cynthia G. contacted Ms. Cline to discuss transportation for Katherine from Marindale to her afternoon placement at ABC and to discuss whether Kentfield would provide an aide to work with Katherine at ABC. On March 6, 2000, an IEP meeting was convened to discuss Ms. G.'s requests. The IEP agreed that the Early Intervention Program ("EIP") staff would take "an informal look" at Katherine's program at ABC to determine if she required an aide at ABC. After observation of Katherine at ABC by members of the EIP staff, and a subsequent IEP meeting in April 2000, the IEP team denied both of Ms. G.'s requests—an aide at ABC and transportation services.

Also in April 2000, Ms. Yourman assessed Katherine in preparation for the upcoming annual IEP meeting. Ms. Yourman administered a number of tests, which indicated that Katherine's expressive language had improved in her SDC over the past year; however, the tests also indicated that Katherine was not quite ready for participation in a full inclusion placement in a regular kindergarten and that she required a structured environment for further improvement. Katherine's parents sent a letter dated April 25, 2000, about one week before Katherine's annual IEP meeting was scheduled to convene, to the superintendent of Kentfield. The letter expressed, among other things, their concern that placing Katherine in a special day class would not be in her best inter-

ests and that the G.'s were seeking to have Katherine placed in the regular kindergarten classroom at Bacich Elementary ("Bacich"), a Kentfield elementary school.

Katherine's annual IEP meeting convened on May 1, 2000, and again on May 25, 2000. The parties, however, failed to reach an agreement with regard to Katherine's placement for the 2000–2001 school year or the 2000 ESY. Katherine's parents were of the position that Katherine should be enrolled at Bacich during the 2000–2001 school year; for the 2000 ESY, they desired Katherine to be placed at ABC for six weeks, provided an aide, and provided speech therapy by Patricia Toboni, occupational therapy at ABC, and audio integration training. Kentfield's representatives, however, were apparently of the view that Katherine should remain in Ms. Yourman's SDC.

Over the summer, Katherine's parents procured private speech and language services, as well as "auditory integration training," and continued Katherine's placement at ABC. She did not attend any Kentfield program, nor did she receive any related services from Kentfield during the summer of 2000.

On August 7, 2000, Kentfield sent a letter to Katherine's parents regarding the proposed placement for the 2000–2001 school year. Kentfield offered placement in the morning, kindergarten special day class at Coleman Elementary School taught by an experienced and qualified special day class instructor, and an inclusion experience in the regular education kindergarten class at Bacich from 12:00 p.m. to 2:15 p.m. every day. In addition, Kentfield offered direct speech and language services, three sessions per week, thirty minutes per session; speech therapy consultations with a teacher, once every two weeks, thirty minutes; direct occupational therapy services, two sessions per

week, thirty minutes per session; occupational therapy consultation with a teacher, sixty minutes per month; transportation services; Ms. Yourman's consultation with each of Katherine's teachers for a total of 15–30 minutes per week; and the current SDC teacher's consultation with the regular education teacher, 15–30 minutes per week. Katherine's parents rejected this proposed placement. They enrolled her instead at Trinity Lutheran School ("Trinity"), a private school, for the 2000–2001 school year and engaged private support services.

### B. *Procedural History*

#### 1. *Due Process Hearing Before, and Decision by, SEHO Hearing Officer*

In early June 2000, both Katherine and the District separately requested a due process hearing. Trevor Skarda, Hearing Officer (the "HO") for the California Special Education Hearing Office ("SEHO"), presided over the consolidated hearing. The hearing took place over the course of eleven days in August, September, and October 2000. The HO heard testimony from seventeen witnesses and considered extensive documentary evidence. The parties submitted closing memoranda, and the hearing was deemed closed as of December 12, 2000.

On January 5, 2001, the HO issued a 33–page written decision (the "Decision" or "Dec."). The HO found that the District failed to provide Katherine with a free appropriate public education ("FAPE") for the 1999–2000 school year and the 2000 ESY. (Dec. at 13–24, 32.)[4] Specifically, the HO found that the District committed

a procedural violation of the IDEA by failing adequately to discuss with Katherine's parents opportunities for "mainstreaming"—placement in a regular academic setting. (*Id.* at 17.) This failure, the HO found, resulted in the loss of educational opportunity for Katherine, and therefore it constituted a denial of an FAPE. (*Id.*) The HO also found that Katherine's placement was "substantively" inappropriate because it was not designed to meet Katherine's unique needs, it was not reasonably calculated to provide her with some educational benefit, it did not comport with her IEP, and it was not provided in the least restrictive environment. (*Id.* at 17–24.)

But the HO also found that the District did offer Katherine an FAPE for the 2000–2001 school year. (*Id.* at 24–27, 32.) In particular, the HO reviewed the testimony of the witnesses at the hearing and concluded that a full inclusion placement, the alternative urged by Katherine's parents, even supplemented with appropriate aides and services, would provide Katherine with no educational benefit. (*Id.* at 24–27.) In light of this finding, the HO concluded that a full inclusion placement would not provide Katherine with an FAPE for the 2000–2001 school year, and therefore the District complied with its obligations under the IDEA. (*Id.* at 27.)

The HO ordered the District to reimburse Katherine's parents for one-half of the tuition they paid to ABC and Katherine's transportation costs, but he denied Katherine's request for reimbursement of expenditures for private speech and language therapy sessions, consultation services provided by Dr. Lee, occupational

---

4. For the sake of accuracy, the Court notes that all of the HO's findings regarding the "District" that are discussed in this Order were in fact made only with respect to Kentfield, which he had defined as the "District" in his Decision, as distinct from the "County."

(*Id.* at 1.) Evidently, the County was not represented at the hearing. (*Id.* at 1 & n. 1.) Nevertheless, for ease of reading, the Court refers to the findings of the HO that pertain to Kentfield as pertaining to the "District."

therapy services, and auditory integration training. (*Id.* at 28–32.) The HO also found that Katherine was not entitled to compensatory education services. (*Id.* at 32.) The HO apprised the parties that they had the right to appeal the Decision to a court of competent jurisdiction within 90 days of receipt of the Decision. (*Id.* at 33.)

### 2. *Litigation in This Court*

Katherine filed a Complaint against the District in this Court on April 4, 2001, seeking review of the HO's Decision pursuant to 20 U.S.C. § 1415(i)(2).[5] Katherine seeks an order that the HO's Decision be set aside; a declaration that the District denied her an FAPE for the 2000 ESY and the 2000–2001 school year, including the 2001 ESY, by failing to offer her a full inclusion placement, including appropriate related services; reimbursement of costs her parents incurred as a result of the private placement and provision of private services; and for reasonable attorney's fees and costs, both in the underlying administrative action and in the instant action.

On June 13, 2001, the District filed an Answer to Plaintiff's Complaint (the "Answer"), and it also filed a Counterclaim for Relief from Administrative Decision Pursuant to 20 U.S.C. § 1415 & FRCP 13(a) & (c) (the "Counterclaim").[6] The Counterclaim asserts a single counterclaim, which is also brought pursuant to 20 U.S.C. § 1415(i)(2). This counterclaim challenges the HO's findings in his Decision that the District failed to provide Katherine an FAPE for the 1999–2000 school year and for the 2000 ESY and that Katherine was

entitled to reimbursement for one-half tuition and transportation. The Counterclaim prays that the Court, *inter alia,* vacate the portion of the Decision challenged by the Counterclaim and permanently enjoin SEHO from ordering or causing the District to retroactively fund Katherine's private school placement, services, transportation, and related costs; issue a declaratory judgment that the Decision violated the provisions of the IDEA; and award to the District any costs, fees, and damages to which the District is entitled by law and which the Court deems reasonable.

Katherine filed Plaintiff's Reply to Defendant's Counter-claim (the "Reply") on July 10, 2001. The Reply asserts affirmative defenses, including: that the Counterclaim fails to state a claim upon which relief can be granted; that the District's counterclaim is barred by the applicable statute of limitations; and that the counterclaim is moot.

On September 27, 2001, Katherine filed a Motion to Supplement Administrative Record, in which she asked the Court to allow her to augment the record from the administrative hearing below with evidence not included in the record. The Court denied Katherine's motion in an Order filed on June 11, 2002.

On October 1, 2002, the District filed Defendants' Joint Motion for Summary Judgment, and on October 2, 2002, Katherine filed Plaintiff's Motion for Summary Judgement (*sic*). Each motion sought summary judgment on each party's respective claim. Both motions, however, were

---

5. Katherine's Complaint also named SEHO as a defendant. On June 13, 2001, the District filed a cross-claim against SEHO, which SEHO answered on September 18, 2001. Pursuant to stipulation of the parties, SEHO was dismissed as a party to this action by Order of the Court on March 22, 2002.

6. Pursuant to the parties' stipulation, in an Order filed on June 1, 2001, the Court granted the District an extension of time to file responsive pleadings.

woefully deficient with regard to providing evidentiary citations in support of the factual assertions set forth therein. The motions also raised certain procedural barriers to appropriate resolution of the parties' claims. Accordingly, in an Order Denying Without Prejudice Motions for Summary Judgment (the "Order Denying Motions Without Prejudice"), filed on January 13, 2003, the Court denied the motions without prejudice to their being renewed with sufficient evidentiary citations [7] and according to certain procedural parameters. In its Order, the Court established a briefing schedule that provided for the parties' filing motions for summary judgment on their respective claims and cross-motions for summary judgment on the opposing party's claims. Pursuant to that briefing schedule, the parties have filed the motions and cross-motions that are presently before the Court.[8] The District has also filed two objections to evidence and a request for judicial notice.

### LEGAL STANDARDS

#### A. *Motions for Summary Judgment Generally*

Under Federal Rule of Civil Procedure 56, summary judgment is warranted against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party moving for summary judgment bears the initial burden of demonstrating the "absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. If the movant meets this burden, the nonmoving party must come forward with specific facts demonstrating a genuine factual issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmoving party "cannot rely on the mere possibility of a factual dispute . . . to avert summary judgment." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Argonaut Ins. Co.,* 701 F.2d 95, 97 (9th Cir.1983) (summary judgment properly granted where defendant failed to present any admissible evidence to support its position); *accord Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data.").

There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, an opposition that fails to identify and reference triable facts is insufficient to preclude the Court's granting of a properly supported summary judgment motion. *See Nilsson, Robbins,*

---

**7.** The Court ordered:

> Every factual assertion made in any brief filed in connection with the aforesaid motions for summary judgment must be supported by evidentiary citations, including page and line references where available. This means that where one or more assertions of fact are contained in a sentence, the evidentiary citation must follow the sentence; it is insufficient to provide an evidentiary citation only at the end of a multisentence paragraph in which factual assertions are made. Any failure to provide an

> evidentiary citation in support of a factual assertion consistent with these guidelines will result in the Court's refusal to consider the factual assertion in resolving the relevant motion.

(Order Denying Mots. Without Prejudice at 8 (boldface and underscoring omitted).)

**8.** Each party's memorandum of points and authorities in support of the party's cross-motion also contains an opposition to the opposing party's motion for summary judgment.

*Dalgarn, Berliner, Carson & Wurst v. La. Hydrolec,* 854 F.2d 1538, 1545 (9th Cir. 1988) (per curiam). Nonetheless, any inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

That the evidence may be available in a party's voluminous exhibits is of no consequence. The Court is not obligated to consider matters not specifically brought to its attention. *See* Schwarzer, Tashima & Wagstaffe, *Cal. Prac. Guide: Fed. Civ. Proc. Before Trial* § 14.145.2 (Rutter Group 1993). The opposition to a summary judgment motion must designate and reference specific triable facts. *Orr v. Bank of Am., NT & SA,* 285 F.3d 764, 774 (9th Cir.2002) (holding that "when a party relies on deposition testimony in a summary judgment motion without citing to page and line numbers, the trial court in its discretion may exclude the evidence"); *Schneider v. TRW, Inc.,* 938 F.2d 986, 990–91 n. 2 (9th Cir.1991) ("[T]he law of this circuit ... recognizes that a district court is under no obligation to mine the full record for triable issues of fact.") (citation omitted); *La. Hydrolec,* 854 F.2d at 1545 ("In the absence of specific facts, as opposed to allegations, showing the existence of a genuine issue for trial, a properly supported summary judgment motion should be granted."); *Frito–Lay, Inc. v. Willoughby,* 863 F.2d 1029, 1034 (D.C.Cir. 1988) ("Appellant's failure to designate and reference triable facts was, in light of the language of Rule 56(c) and governing precedent, fatal to its opposition."); *Nissho–Iwai Am. Corp. v. Kline,* 845 F.2d 1300, 1307 (5th Cir.1988) (rejecting notion that "the entire record must be searched and found bereft of a genuine issue of material fact before summary judgment may be

properly entered"). Thus, it is immaterial that evidence helpful to plaintiff may have been presented somewhere in the record.

### B. IDEA Claims

#### 1. Standard of Review of State Administrative Decision

The IDEA confers on any party aggrieved by the findings and decision made in a state administrative due process hearing regarding the provision of an FAPE the right to bring an original civil action in a state court of competent jurisdiction or in federal district court to review the findings and decision. 20 U.S.C. § 1415(i)(2).[9] The party challenging the decision bears the burden of persuasion on its claim. *Clyde K. v. Puyallup Sch. Dist., No. 3,* 35 F.3d 1396, 1399 (9th Cir.1994).

The district court's review of the decision is somewhat deferential. "Because Congress intended states to have the primary responsibility for formulating each individual child's education, [courts] must defer to their 'specialized knowledge and experience' by giving 'due weight' to the decisions of the states' administrative bodies." *Amanda J. ex rel. Annette J. v. Clark County Sch. Dist.,* 267 F.3d 877, 888 (9th Cir.2001) (quoting in part *Board of Education of Hendrick Hudson Central School District, Westchester County v. Rowley,* 458 U.S. 176, 206–08, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). This review, which has been characterized as a "modified *de novo* review" or "involved oversight," requires the district court to carefully consider the administrative agency's findings. *Susan N. v. Wilson Sch. Dist.,* 70 F.3d 751, 758 (3rd Cir.1995). "The amount of deference accorded the hearing officer's findings increases where they are thorough and careful." *Capistrano Uni-*

---

**9.** Federal district courts have jurisdiction over such actions without regard to amount in controversy. *Id.* § 1415(i)(3)(A).

*fied Sch. Dist. v. Wartenberg,* 59 F.3d 884, 891 (9th Cir.1995). After such consideration, "the court is free to accept or reject the findings in part or in whole." *Susan N.,* 70 F.3d at 758.

### 2. *Consideration of Evidence*

In reviewing an administrative decision, "the court shall receive the records of the administrative proceedings; shall hear additional evidence at the request of a party; and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B). While 20 U.S.C. § 1415(i)(2) empowers the district court to hear testimony not presented during the administrative hearing, the court has wide discretion in determining what additional evidence shall be considered. *See Town of Burlington v. Mass. Dep't of Educ.,* 736 F.2d 773, 791 (1st Cir.1984), *aff'd sub nom. Sch. Comm. of Town of Burlington v. Mass. Dep't of Educ.,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).[10] The Ninth Circuit has construed "additional" to mean "supplemental" evidence. *Ojai Unified Sch. Dist. v. Jackson,* 4 F.3d 1467, 1472–73 (9th Cir.1993). The court may exercise its discretion and allow supplementation in cases due to "gaps in the administrative transcript owing to mechanical failure, unavailability of a witness, an improper exclusion of evidence by the administrative agency, and evidence concern-

ing relevant events occurring subsequent to the administrative hearing." *Id.* (quoting *Town of Burlington,* 736 F.2d at 790).

However, "additional" evidence is *not* evidence which merely repeats or embellishes evidence or testimony presented below. *Id.* In addition, the court must be mindful "of not allowing a party to undercut the statutory role of administrative expertise, the unfairness involved in one party's reserving its best evidence for trial, the reason the witness did not testify at the administrative hearing, and the conservation of judicial resources." *Id.* In short, "the trial court … must be careful not to allow such [additional] evidence to change the character of the hearing from one of review to a trial *de novo.*" *Id.; see also Amanda J. ex rel. Annette J.,* 267 F.3d at 877 ("Complete *de novo* review … is inappropriate.").

### DISCUSSION

### A. *Plaintiff's Motion and Defendants' Cross-motion*

Plaintiff's Motion and Defendants' Cross-motion seek summary judgment in the respective moving parties' favors on Katherine's claim. The motions present the following issues: First, did the HO properly apply the appropriate analytical framework and consider all of the facts presented in evaluating whether Katherine was provided an FAPE for the 2000 ESY and the 2000–2001 school year?[11] Second,

---

**10.** The provision presently codified at 20 U.S.C. § 1415(i)(2)(B) was previously codified at 20 U.S.C. § 1415(e)(2).

**11.** Katherine's Complaint prays for relief that includes the Court's making a finding that the District failed to offer Katherine an FAPE for the 2001 ESY. The HO, however, did not reach this issue, presumably because the 2001 ESY had not yet taken place. Katherine herself makes no argument whatever regarding the 2001 ESY in her moving papers, and the District has ignored it as well. Given that the

HO did not make any findings or decision with regard to the 2001 ESY, no claim for relief can lie under § 1415(i)(2) with regard to the 2001 ESY.

The Court is empowered to enter summary judgment *sua sponte* provided that the proponent of the claim was on notice that he or she was required to come forth with all available evidence in support of her claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). There can be little doubt that Katherine has been on notice for quite some time that she was required to

under the appropriate analytical framework, does the evidence in the record support a finding as a matter of law that Katherine was provided an FAPE, or does it support a finding that she was not provided an FAPE? The Court addresses these issues in turn.

### 1. Did the HO Properly Apply the Appropriate Analytical Framework and Consider All of the Facts Presented in Evaluating Whether Katherine Was Provided an FAPE for the 2000 ESY and the 2000–2001 School Year?

Neither Katherine nor the District take issue with the HO's articulation of the framework for analyzing whether Katherine was provided an FAPE. Where they part company is on the issues of whether he correctly applied the appropriate framework and whether he considered all the facts presented at the hearing.

Despite the parties' agreement as to the appropriate analytical framework, the Court will review whether the framework articulated by the HO was correct. It will then turn to the areas of dispute between the parties.

### a. Accuracy of HO's Articulation of the Appropriate Framework for Determining, for Purposes of IDEA Claims, Whether an FAPE Was Provided

The HO, citing *Board of Education of Hendrick Hudson Central School District, Westchester County v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), set out the following general framework for determining whether Katherine was provided an FAPE for the relevant time periods: "the analysis of whether a student has been provided a FAPE is twofold, requiring the hearing officer to determine whether the procedural safeguards of the IDEA have been satisfied and to determine whether the FAPE provided was substantively appropriate." (Dec. at 15.) With regard to "procedural appropriateness," the HO observed, placement must be provided consistent with the various procedural protections for the student and the student's parents established under the IDEA, such as the parents' right to participate in the development of the student's IEP. (*Id.* at 14–15.) Noncompliance with procedural directives, however, does not require a finding of denial of an FAPE unless it results in the loss of educational opportunity to the student or seriously infringes on his or her parents' opportunity to participate in the IEP process. (*Id.* at 15.)

With regard to "substantive appropriateness," according to the HO, an appropriate placement must (1) be designed to meet the student's unique needs; (2) be reasonably calculated to provide him or her with some educational benefit; (3) comport with his or her IEP; and (4) be provided in the least restrictive environment ("LRE"). (*Id.* at 14.) The HO stated that in determining whether the placement is in the least restrictive environment, under Ninth Circuit law, he was to employ a balancing test in which four factors were to be considered: (1) the educational benefits available to the disabled student in a regular classroom, supplemented with appropriate aides and services, as compared with the educational benefits of a special education classroom; (2) the nonacademic benefits of interaction with children who are not disabled; (3)

come forth with all available evidence in support of her claim, including evidence with respect to the 2001 ESY, at this stage of the proceedings. Because she has failed to do so, the Court *sua sponte* ORDERS that summary judgment be entered in favor of the District on Katherine's claim with respect to her challenges regarding placement for the 2001 ESY.

the effect of the disabled student's presence on the teacher and the other children in the regular classroom; and (4) the cost of mainstreaming the disabled student in a regular classroom. (*Id.* at 25.)

Despite the parties' wholesale embracement of the HO's articulation of the applicable analytical framework, the HO's overarching substantive/procedural analytical paradigm finds no support in the relevant authorities. Although the HO cited *Rowley* for the aforementioned two-step inquiry involving "procedural appropriateness" and "substantive appropriateness" of the placement provided the disabled student, *Rowley* establishes a somewhat different two-step inquiry:

> [A] court's inquiry in suits brought under § 1415[ (i)(2) ] is twofold. First, has the State complied with the *procedures* set forth in the [IDEA]? And second, is the *individualized education program* developed through the [IDEA's] procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

458 U.S. at 206–07, 102 S.Ct. 3034 (emphasis added). *Rowley* thus creates an analytical distinction between (1) whether the school district complied with the IDEA's various procedural requirements and (2) whether the IEP developed for the disabled student is reasonably calculated to enable the student to receive educational benefits. *Id.* It does not, as the HO apparently believed, (*see* Dec. at 15), distinguish between the procedural appropriateness and the substantive appropriateness of the child's placement.

Turning to the application of this framework in the instant case, Katherine has never placed in issue whether the IEP developed for her was reasonably calculated to enable her to receive educational benefits—the second step of the *Rowley* inquiry. She has argued only that certain procedures under the IDEA were not honored: with regard to the 1999–2000 school year and the 2000 ESY, she claims that the District failed to comply with several procedural safeguards established for her and her parents' protection under the IDEA, resulting in denial of educational opportunity; with regard to the 2000–2001 school year, she argues that the placement she was offered was not in the least restrictive setting. The HO evidently construed Katherine's first challenge (concerning compliance with various IDEA procedural safeguards) as relevant to the "procedural appropriateness" of her placement and the second (concerning the LRE mandate) as relevant to the distinct issue of the "substantive appropriateness" of her placement.

Review of relevant Ninth Circuit authorities, however, makes clear that both of these challenges to the District's compliance with its obligations under the IDEA are "procedural," falling under the first step of the *Rowley* inquiry. In *Poolaw v. Bishop,* 67 F.3d 830 (9th Cir.1995), the Ninth Circuit applied the two-step analytical framework of *Rowley* to determine whether the defendant school district had complied with its obligations under the IDEA. *Poolaw,* 67 F.3d at 834. As part of its review the court, *inter alia,* considered the plaintiffs' argument that the district had failed to mainstream the disabled student to the maximum extent appropriate as required by 20 U.S.C. § 1412(5)(B) (now 20 U.S.C. § 1412(a)(5)(A)). *Id.* Significantly, the court addressed this argument by expressly placing it under the "procedural compliance" prong—the first step—of the two-step *Rowley* analytical framework. *Id.* at 834–36.

Katherine's argument that the District failed to honor the IDEA's procedural safeguards is no less, and no more, a procedural challenge for purposes of the *Rowley* framework. In *W.G. v. Board of Trustees of Target Range School District No. 23, Missoula, Montana,* the plaintiffs argued that the defendant school district had flouted the procedural safeguards of the IDEA and Montana law by developing the IEP at issue without the input and participation of the student and the student's parents, the student's regular classroom teacher, or any representative of the private school which the student was attending. 960 F.2d 1479, 1484 (9th Cir. 1992). The Ninth Circuit expressly considered this challenge under the first step of the *Rowley* test, the "procedural compliance" inquiry. *Id.* at 1485. Because it concluded that the district had failed to comply with the IDEA's procedures, it did not address the second step of the *Rowley* analysis—whether the resulting IEP was reasonably calculated to enable the student to receive educational benefits. *Id.*

These authorities demonstrate that although the HO may have found it useful to distinguish between the procedural appropriateness and the substantive appropriateness of Katherine's placement for purposes of his discussion of the relevant issues, the distinction itself has no basis in law, at least insofar as the HO purported to apply the *Rowley* analytical framework. Both of Katherine's challenges—that the District failed to honor certain procedural safeguards and that the District failed to offer Katherine placement in the least restrictive environment—fall under the first step of the *Rowley* inquiry.

■ The HO was correct that "[p]rocedural flaws do not automatically require a finding of a denial of a FAPE, but procedural violations that result in the loss of educational opportunity to the student or seriously infringe on the parent's opportu-

nity to participate in the IEP process do result in the denial of a FAPE," (Dec. at 15). The Ninth Circuit has expressed the rule cited by the HO in this way: "Procedural flaws do not automatically require a finding of a denial of a FAPE. However, procedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, clearly result in the denial of a FAPE." *W.G.*, 960 F.2d at 1484 (citations omitted). ("Procedural flaws," as the foregoing discussion makes clear, include not just violations of the IDEA's procedural safeguards, but also noncompliance with other procedural obligations imposed by the IDEA, such as the LRE requirement.)

By its plain language, this rule does not posit that procedural inadequacies *must* result in the loss of educational opportunity or seriously infringe the parents' opportunity to participate in the IEP formulation process for a denial of an FAPE to be found; it posits only that such results are clearly *sufficient* to constitute a denial of an FAPE. Accordingly, denial of an FAPE can be found in other situations contemplated by the IDEA, such as where the educational instruction provided fails to address the child's unique needs, where the school district fails to provide adequate support services so the child can benefit from the instruction, where the instruction and services are not provided at public expense and under public supervision, where they do not meet the state's educational requirements, or where they do not comport with the child's IEP. *See Rowley,* 458 U.S. at 188–89, 102 S.Ct. 3034; *Capistrano Unified Sch. Dist. v. Wartenberg,* 59 F.3d 884, 893 (9th Cir.1995).

■ Denial of an FAPE can also occur, as discussed above, where the child's placement does not comply with the IDEA's requirement that it be in the least restrictive environment. Compliance with

this last obligation is determined in the Ninth Circuit by balancing the following four factors first articulated in *Sacramento City Unified School District, Board of Education v. Rachel H.*: (1) the educational benefits of placement full-time in a regular class; (2) the non-academic benefits of such placement; (3) the effect the student has on the teacher and children in the regular class; and (4) the costs of mainstreaming the student. 14 F.3d 1398, 1404 (9th Cir.1994).

Accordingly, although the HO's distinction between procedural appropriateness and substantive appropriateness and his underlying multi-pronged tests for procedural and substantive appropriateness were not based on any specific analytical construct established by the Supreme Court or the Ninth Circuit, the substantive tests he invoked for determining whether

Katherine was denied an FAPE—*i.e.*, the four-prong test for "substantive appropriateness," the related four-factor balancing test for whether Katherine was placed in the least restrictive environment required by the IDEA, and the two-part test for whether "procedural flaws" result in a denial of an FAPE—were fully supported by the applicable authorities.[12] The Court therefore concludes that the HO's articulation of the relevant analytical approach was consistent with applicable law and, therefore, appropriate.

### b. *HO's Application of Relevant Factors for Determining Whether Katherine Was Denied an FAPE for the 2000–2001 School Year*

Katherine argues that, with regard to the HO's analysis and findings for the 2000 ESY and the 2000–2001 school year, the

---

**12.** To be sure, the Ninth Circuit has evidently adopted an interpretation of *Rowley* similar to that employed by the HO. In *Capistrano Unified Sch. Dist. v. Wartenberg*, the Ninth Circuit interpreted *Rowley* to hold that "a child receives a free appropriate public education if the program (1) addresses the child's unique needs, (2) provides adequate support services so the child can take advantage of the educational opportunities, and (3) is in accord with the individualized education program." 59 F.3d 884, 893 (9th Cir.1995) (citing *Rowley*, 458 U.S. at 188–89, 102 S.Ct. 3034). These three criteria are the first three criteria of the HO's four-criterion test for "substantive appropriateness" of a placement of a disabled child under the IDEA, the fourth criterion being that the placement be provided in the least restrictive environment. (Dec. at 14.) (The HO, however, did not cite to *Wartenberg* in setting out his four-criterion test.)

The Court questions the accuracy of the *Wartenberg* court's interpretation of the portion of *Rowley* referenced above as holding that a state provides an FAPE if the program it provides meets the aforementioned three criteria. A merely cursory review of the cited portion of *Rowley* reveals that the Supreme Court identified other aspects of an educational program that had to be in place for a court to find that an FAPE had been provid-

ed, such as that the instruction and services be provided at public expense and under public supervision, meet the state's educational standards, and so forth. *See Rowley*, 458 U.S. at 188–89, 102 S.Ct. 3034 ("According to the definitions contained in the [IDEA], a 'free appropriate public education' consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction. Almost as a checklist for adequacy under the [IDEA], the definition [of an FAPE] also requires that such instruction and services be provided at public expense and under public supervision, meet the State's educational standards, approximate the grade levels used in the State's regular education, and comport with the child's IEP."). Nevertheless, the Court does not disagree that a state's failure to satisfy any of these three criteria constitutes a denial of an FAPE. Accordingly, provided that none of the other requirements for an FAPE are at issue, the HO reasonably relied on a construct established by the Ninth Circuit, namely the three-criterion test discussed in *Wartenberg*, supplemented by examination of the LRE requirement, to forge an appropriate four-prong test for whether Katherine's placement was "substantively appropriate."

HO failed to conduct a full analysis because he failed to consider all four factors articulated in *Rachel H.* relevant to determining whether the District's placement of Katherine would have been in the least restrictive environment. Instead, according to Katherine, the HO considered only the first factor, namely whether placement in a full inclusion setting would have resulted in educational benefit for Katherine. The District responds that under *Poolaw v. Bishop,* 67 F.3d 830 (9th Cir.1995), the HO acted properly because not all four factors are equal. According to the District, "[i]f a hearing officer or a court finds that a child cannot receive meaningful educational benefit in a regular classroom placement, this finding trumps the other [*Rachel H.*] factors, irrespective of whether they weigh in favor of mainstreaming." (Defs.' Opp. to Pl.'s Mot. at 12.)

At the outset, the Court notes that although Katherine takes issue with the HO's analysis and findings regarding the 2000 ESY, as well as those for the 2000–2001 school year, Katherine presents no substantive argument or analysis regarding the HO's discussion of the 2000 ESY. Indeed, it is a mystery why Katherine is challenging the HO's conclusion that she was entitled to a full inclusion placement for the 2000 ESY (which conclusion was based on his belief that the 2000 ESY was not a new school year, but merely a continuation of the 1999–2000 school year), since the HO nevertheless concluded that she was denied an FAPE for the 2000 ESY. (Dec. at 24.) Even though the HO awarded Katherine only a fraction of the costs for which she sought reimbursement for the 2000 ESY, the HO's decision to do so did not turn on his conclusion that Katherine was not entitled to a full inclusion placement for the 2000 ESY. (*See id.* at 28–32.) Katherine does not explain in any respect why she believes the HO erred by not awarding her all the costs she sought for the 2000 ESY or by concluding that

she was not entitled to a full inclusion placement for the 2000 ESY; the entirety of her arguments in her motion for summary judgment are directed to the HO's findings and analysis for the 2000–2001 school year. Since Katherine bears the burden of proof in challenging the HO's findings and decision, *Clyde K. v. Puyallup Sch. Dist., No. 3,* 35 F.3d 1396, 1399 (9th Cir.1994), the Court DENIES Plaintiff's Motion and GRANTS Defendants' Cross-motion with respect to the portion of Katherine's claim relating to the 2000 ESY.

Turning to the 2000–2001 school year, Katherine is correct that the HO considered only the first factor of the four-factor balancing test articulated in *Rachel H.* (The HO did, however, state in a footnote that the District did not dispute the last of the *Rachel H.* factors; thus, the HO concluded, the issue of costs of mainstreaming Katherine was "not relevant." (Dec. at 25 n. 26.)) The question, then, is whether the HO's decision to do so was appropriate.

Both Katherine's arguments and the District's arguments have a degree of merit. On the one hand, Katherine is correct that *Rachel H.* envisions consideration and balancing of *all* four of the relevant factors. *See Poolaw,* 67 F.3d at 836–37 (noting that the Ninth Circuit in *Rachel H.* held that a court "*should* consider" the four factors and analyzing the facts at issue with respect to each of the four factors). On the other hand, the District is correct that *Poolaw* strongly suggests that where a court finds that mainstreaming will provide no educational benefit— that is, that the first factor weighs entirely against a finding that the school district has failed to provide the student with instruction and services in the least restrictive environment—that finding can be dispositive of the entire LRE analysis, even if the other three factors weigh in favor of mainstreaming. *See id.* (noting that "the

IDEA is primarily concerned with the long term educational welfare of disabled students" and dismissing the non-academic benefits of mainstreaming the plaintiff-student and the lack of any detrimental effect on classroom and teacher where mainstreaming would provide no educational benefit). Accordingly, the Court concludes that although the HO should have considered all four of the relevant factors for, if nothing else, the sake of thoroughness, the HO properly determined that his finding that mainstreaming would provide Katherine with no educational benefit was dispositive of the entire LRE analysis.

But the mere fact that the HO could properly base his overall LRE determination on his analysis of the first factor does not mean that his analysis is entitled to deference. If the HO did not consider all the material evidence in the record that would be relevant to his analysis of the first factor, the HO's analysis would not be entitled to deference. The Court now turns to a consideration of the HO's review of the relevant evidence.

### c. HO's Consideration of Evidence in Evaluating the First Factor of the Four-factor Rachel H. Test for Compliance with the IDEA's Mainstreaming Requirement

■ The thrust of Katherine's assault on the HO's analysis of whether the District provided her with an FAPE for the 2000–2001 school year is that the HO failed to consider the testimony of four key witnesses—Pat Territo, Jamaica Stevens, Patricia Toboni, and Patty Reader–Harrison,[13]—placed too much weight on the testimony of certain other witnesses, and too easily dismissed the testimony of several others. The District does not deny that the HO failed to consider the testimony of the four witnesses, but it contends that the testimony of three of them were not entitled to much credence. The District also asserts that the HO properly dismissed the testimony of certain witnesses and properly credited the testimony of certain others.[14]

The Court agrees with Katherine that the HO's failure to consider the testimony

13. Katherine also cites the HO's failure to consider the testimony of Ms. Holly Edde, Katherine's regular education teacher at Bacich. Katherine's discussion regarding Ms. Edde consists primarily of the following:

> The regular education teacher at Bacich, Ms. Edde testified as to the some [sic] of the skills incoming kindergartners possess. She stated that some of them can count to twenty and fewer can count to one hundred. (Exh. 2 to Decl. of Counsel.) Ms. Edde testified that most can write their first name, but not their last name. (Id.) She testified that on average three quarters of her incoming class can stay seated quietly during circle time. (Id.)
>
> (Pl.'s Mot. at 14–15.)

Katherine does not explain the significance of these facts. Moreover, she fails to include page and line references in her evidentiary citations, as required by the Court's Order Denying Motions Without Prejudice, and thus the Court will disregard them. Accordingly, the Court need not address whether the HO should have considered Ms. Edde's testimony, nor will the Court consider her testimony now.

14. Along with Defendants' Cross-motion, the District has filed Defendants' Objections to Purported Evidentiary Citations in Plaintiff's Motion for Summary Judgment (the "Objections to Plaintiff's Motion"). The thrust of the Objections to Plaintiff's Motion is that Plaintiff's Motion cites to the HO's Decision as evidentiary support for various assertions of fact, even though, the District contends, as a matter of law such matter cannot constitute appropriate evidentiary support. The District asks the Court to "refuse to consider every factual assertion wherein Plaintiff's sole evidentiary citation is to the hearing officer's Decision." (Objections to Pl.'s Mot. at 2.) (The Objections to Plaintiff's Motion also asks the Court to disregard all assertions of fact made in Plaintiff's Motion that are not supported by evidentiary citations at the end of each sentence in which such assertions are made.)

Although the District claims that there are no less than 31 such objectionable citations in

of the four witnesses mentioned above was significant and inexcusable, regardless of whether their testimony was ultimately persuasive. Ms. Territo was the director of ABC, and Ms. Stevens was Katherine's teacher at ABC for the summer of 2000. Ms. Toboni was a private speech therapist retained by Katherine's family to provide her with speech and language therapy using the Links to Language program. And Ms. Reader–Harrison was the instructional aide hired by Katherine's family for assistance at Trinity. Surely these four witnesses' testimony was worth consideration and discussion.

In light of the HO's failure to address the testimony of these four witnesses, the Court concludes that the HO's ultimate finding regarding the first *Rachel H.* factor—that mainstreaming would not provide Katherine with any educational benefit—is not entitled to deference. The Court now conducts a *de novo* review of the HO's analysis and the record to determine whether the District's putative placement of Katherine for the 2000–2001 school year was in the least restrictive environment consistent with the IDEA.

2. *Does the Evidence in the Record Support a Finding that Katherine Was Provided an FAPE for the 2000–2001 School Year?*

■ As Katherine correctly observes, (Pl.'s Mot. at 5), the IDEA does not require that a child with special needs receive the absolute best or "potential maximizing" education, but rather a "basic floor of opportunity" consisting of access to specialized instruction and related services that are individually designed to provide educational benefit. *Rowley,* 458 U.S. at 201, 102 S.Ct. 3034. Consequently, since Katherine is challenging the District's placement of her for the 2000–2001 school year, to prevail on her motion she will have to show that, based on the evidence in the administrative record, as a matter of law it is more likely than not that a full inclusion setting would have provided her with educational benefit constituting at least that basic floor of opportunity. *See Clyde K.,* 35 F.3d at 1399. The Court must determine whether Katherine has successfully made this showing.

Even though the Court has concluded that the HO's finding that Katherine would not receive any benefit from a fully mainstreamed placement for the 2000–2001 school year is not entitled to deference, the Court need not dismiss *all* of the HO's findings and observations; it may properly credit them where they are well-reasoned and well-supported. The Court will therefore defer to the HO's findings and conclusions where appropriate and weigh them in conjunction with its review of the evidence in the record, including the testimony that the HO failed to consider.

Plaintiff's Motion, the District has failed to specify where in Plaintiff's Motion the Court can find these citations. The Court is not inclined to scour Katherine's papers for each of the allegedly objectionable citations, nor is the Court obligated to do so. Moreover, the Court notes from its reading of Plaintiff's Motion that some of these citations are clearly proper, as they are employed where Katherine is discussing what the HO found or concluded, not what the evidentiary support for such finding or conclusion is. (*E.g.,* Pl.'s Mot. at 3.) Accordingly, the Court OVERRULES these objections.

Nevertheless, to the extent that Katherine has cited to the Decision as evidentiary support for an underlying fact, the Court disregards any such citation and the statement it purports to support. The Court in its discretion also disregards factual assertions made by Katherine, as well as those by the District, that are not supported by evidentiary citations at the end of each sentence in which such assertions are made. (*See* Order Denying Mots. Without Prejudice at 8.)

### a. *Evaluation of Testimony Considered by the HO*

#### i. *Clara Yourman*

The HO's Decision suggests that he found most persuasive the testimony of Clara Yourman, Katherine's special day class teacher for the 1998–1999 and 1999–2000 school years. The HO stated that "Ms. Yourman presented as an exceptional witness." (Dec. at 25.) The HO observed that Ms. Yourman testified that Katherine would not receive educational benefit from placement in the regular Kindergarten classroom at Bacich with an instructional aide and modifications to the curriculum. (*Id.* at 25–26.) Her opinion evidently rested on her assessment of Katherine's deficits in the areas of expressive and receptive language, as well as auditory processing, and her conclusion that Katherine had not yet acquired the necessary academic readiness skills to be successful in a full inclusion kindergarten. (*Id.* at 26.) The HO noted that this view was expressed by all of the District's employees who testified at the hearing. (*Id.*)

Katherine contends that the HO should not have accorded Ms. Yourman's testimony much weight. Her criticism of Ms. Yourman's testimony rests exclusively on the observation that Ms. Yourman "had neither seen the regular education classroom proposed by the District, nor observed Katie in the regular education program at Trinity Lutheran School." (Pl.'s Mot. at 10.) But Katherine does not provide any explanation as to why these facts undermine the persuasiveness of Ms. Yourman's testimony. Moreover, Katherine's citation to the HO's Decision for the foregoing proposition is inapposite: the cited pages, pages 26 and 27 of the Decision, do not contain any statement to the effect that Ms. Yourman had neither seen the regular education classroom proposed by the District nor observed Kath-

erine in the regular education program at Trinity.

At any rate, surely two years of closely working with Katherine, as well as her conducting several tests on Katherine to determine her readiness for Kindergarten, provided Ms. Yourman with tremendous insight into whether she would gain any educational benefit from placement in a full inclusion setting. Moreover, the Court is conscious that the HO was able to observe and listen to Ms. Yourman testify in person, whereas the Court's review of her testimony is confined to reading a transcript. The HO thus was in a better position than the Court presently is to determine whether Ms. Yourman's opinion was worth crediting. And the Court can understand why Ms. Yourman was perceived to be an impressive witness: she had an impressive background in terms of education and experience, she spoke knowledgeably about Katherine's development and the challenges she faced, and she evidently possessed an understanding of the skills Katherine would need to possess to benefit educationally from a full inclusion kindergarten placement. The Court therefore defers to the HO's evaluation of Ms. Yourman's testimony and gives substantial weight to Ms. Yourman's opinion about whether Katherine would benefit educationally from full mainstreaming.

#### ii. *Ilene Lee*

The next witness whose testimony the HO addressed was Dr. Ilene Lee, the family's behavioral consultant. Dr. Lee opined that Katherine would be successful in a full inclusion program with a one-on-one aide. The HO dismissed Dr. Lee's opinion, however, on the ground that she also opined that *no* child should be placed in a special day class. (Dec. at 26.)

Katherine does not make any effort to dispute the validity of the HO's dismissal of Dr. Lee's opinion. The Court agrees

with the HO's decision effectively to assign Dr. Lee's opinion no weight: if Dr. Lee believed that no child should be placed in a special day class, but there was at least a possibility that the least restrictive environment for Katherine would be a special day class (along with special programs or services), there was no reason to conclude that Dr. Lee's opinion was objective and informative with regard to Katherine's particular situation.

### iii. *Robert Koegel*

The next witness whose testimony the HO addressed was Dr. Robert Koegel. Dr. Koegel was an expert in the field of autism and a professor at the University of California at Santa Barbara, as well as the founder and director of the University's Autism Research Center. Dr. Koegel watched a video of Katherine shot while she was at ABC, reviewed her records and assessments, and briefly observed her in her current program at Trinity. Based on his observations, record review, and video review, he testified that he believed Katherine could be successful in a regular education program with a one-on-one aide.

Although the HO did not explicitly say so, the HO evidently did not accord Dr. Koegel's opinion substantial weight. The HO specifically cited the facts that Dr. Koegel did not talk to Ms. Yourman, the individual who worked the most with Katherine over the previous two school years, and that he did not observe the proposed kindergarten program at Bacich. (*Id.*) The HO also noted that Dr. Koegel was of the opinion that full inclusion should always be attempted first, that one cannot know if a child can be fully included until one tries. (*Id.* at 26–27.) Apparently, these considerations undermined the persuasiveness of Dr. Koegel's testimony in the eyes of the HO.

Katherine argues that the HO erred by not according Dr. Koegel's opinion more weight. In her opening brief for her mo-

tion for summary judgment, Katherine effectively reiterates Dr. Koegel's qualifications and the basis for his opinion. (*See* Pl.'s Mot. at 15–16.) She also points out that, contrary to the HO's understanding, Dr. Koegel never testified that a full inclusion placement should always be attempted. (*Id.* at 16.)

The District responds that Dr. Koegel did in fact believe that all children with disabilities should be in inclusive placements. (Defs.' Opp. to Pl.'s Mot. at 13.) The District goes on to argue that the HO properly rejected Dr. Koegel's opinion based on his categorical approach to placement of disabled children because the IDEA contemplates formulation of individualized programs, not categorical ones. (*Id.* at 13–14.)

Review of the administrative transcript reveals that Katherine is correct that, contrary to the HO's understanding of his testimony, Dr. Koegel did not testify that disabled children should always be placed in fully inclusive environments. (*See* Received Transcript ("RT") Oct. 17, 2000, at 124:4–24.) Nevertheless, the sole scenario that Dr. Koegel described in which full inclusion would not be appropriate—a scenario that was hypothetical, as Dr. Koegel was unable to describe such a scenario from actual experience—appeared so exceptional as to be fairly unrealistic:

A child who who [*sic*] is um very low functioning in terms of uh being nonverbal and uh also very low functioning cognitively on both standardized tests and behavioral assessments, um and where um the support services in the special day class were very strong, and the support services in the full inclusion classroom were very weak. In that case, um and that particular child is not a child I worked with directly, but in that case I think I would've probably recommended the special day class.

(*Id.* at 124:17–24.) The scenario thus entailed not only the existence of a child with severe verbal cognitive disabilities, but also a dramatic discrepancy between the quality of the support services in the special day class and those in the full inclusion classroom. (*Id.*) There was no suggestion, however, that these conditions are even remotely commonplace. Accordingly, although Dr. Koegel's views about the suitability of disabled children for placement in a full inclusion setting may not have been literally categorical, they were near-categorical.

Given these views, the HO properly discounted Dr. Koegel's opinion. The IDEA envisions a case-by-case evaluation of the least restrictive environment for each child. If Congress intended the least restrictive environment for all children to be full inclusion settings, it would have said so. Dr. Koegel's virtually categorical view that disabled children should be placed in full inclusion settings is at odds with the FAPE inquiry envisioned by the IDEA, and thus his opinion regarding Katherine's suitability for a full inclusion placement must be accorded little weight.[15]

#### iv. *Robert Patterson*

The last witness whose testimony the HO considered with regard to Katherine's placement for the 2000–2001 school year was Dr. Robert Patterson. The HO evidently found his testimony and opinions persuasive, as he stated in his Decision that "Dr. Patterson presented as an excellent witness." (Dec. at 27.) Dr. Patterson was a licensed psychologist, a licensed marriage, family, and child counselor, and a licensed educational pathologist. He also had a doctorate in psychology and family therapy. Dr. Patterson explained that he did not believe Katherine could be

successful at the present time in a full inclusion setting, even with a one-on-one aide and other support services. He opined that Katherine had not yet acquired the pre-academic skills to succeed and that an aide in a full inclusion setting would need to be a teacher. Even then, Dr. Patterson testified, she would likely regress.

The Court's review of Dr. Patterson's testimony and the weight the HO accorded his testimony is similar to the Court's review of Ms. Yourman's testimony and the weight the HO accorded her testimony. Similar to her criticism of Ms. Yourman's testimony, Katherine's sole criticism of Dr. Patterson's testimony is that he "never personally observed Katie and had never spoken to anyone who had worked with Katie in a regular education setting." (Pl.'s Mot. at 10.) But also similar to her criticism of Ms. Yourman's testimony, Katherine fails to explain why these facts undermine the persuasiveness of his testimony and opinions. In addition, Katherine fails to provide an evidentiary citation for her contention that Dr. Patterson never personally observed Katie and had never spoken to anyone who had worked with Katie in a regular education setting, and therefore the Court, consistent with its Order Denying Motions Without Prejudice, will disregard the contention. Moreover, as with Ms. Yourman, the Court is conscious that the HO was able to observe and listen to Dr. Patterson in person, whereas the Court's review of his testimony is confined to reading a transcript. The HO thus was in a better position than the Court presently is to determine whether Dr. Patterson's opinion was worth crediting. Finally, as with Ms. Yourman, the Court understands why the HO found Dr.

---

**15.** Given that the Court agrees with the HO's discounting of Dr. Koegel's opinion based on his near-categorical view about the suitability of disabled children for full mainstreaming, the Court does not reach the validity of the HO's other apparent bases for discounting Dr. Koegel's opinion.

Patterson to be an impressive witness: Dr. Patterson has strong qualifications and experience, and he clearly displayed a thorough knowledge of the subject matter that he was discussing. The Court therefore defers to the HO's evaluation of Dr. Patterson's testimony and gives substantial weight to Dr. Patterson's opinion about whether Katherine would benefit educationally from full mainstreaming.

### b. Evaluation of Testimony Not Considered by the HO

#### i. Pat Territo

Katherine contends that the HO should have considered the testimony of Pat Territo, the director of ABC. Ms. Territo offered extensive testimony about Katherine's interaction with other students and her participation in various activities at ABC. Ms. Territo opined that Katherine was ready for a regular education kindergarten.

Although Katherine construes Ms. Territo's testimony as relevant to whether Katherine would gain educational (*i.e.*, academic) benefits from placement in a full inclusion setting—the first factor of the four-factor *Rachel H.* test,—a review of her testimony makes clear that her testimony bears only on the *non-academic* benefits that Katherine might gain—the second factor of the *Rachel H.* test. As the District correctly points out, the program at ABC in which Katherine was enrolled was not academic. Ms. Territo testified that the morning program at ABC, from 9:00 a.m. to 1:00 p.m., was the "learning" part of their day, while the afternoon program—the program in which Katherine was enrolled—was "less structured," offering "extended care." (RT Sept. 25, 2000 at 28:24–29:3.) To be sure, Ms. Territo explained that the "philosophy" of ABC was that "children learn through play," (*id.* at 29:5–8), but clearly this type of learning at ABC was not educational or academic in the sense of the first factor of the *Rachel H.* framework. As Ms. Territo explained later on in her testimony, the morning program was "kind of our really organized, uh, academic learning time. We don't do anything like that in the afternoon." (*Id.* at 47:14–15.) Moreover, Ms. Territo testified that she had no understanding of any special learning needs that Katherine might have. (*Id.* at 57:25–27.) Not surprisingly, when Ms. Territo was asked about the basis for her opinion that Katherine was ready for a full inclusion kindergarten placement, she testified that she based her opinion on the skills that she deemed necessary to succeed in kindergarten, which were (in her view) "listening, following directions, being able to stay focused," (*id.* at 40:26–27); there was no discussion whatever of the considerations *specifically relevant* to Katherine's learning in *an academic classroom environment,* in contrast to, for example, Ms. Yourman's testimony.

Based on this review, the Court concludes that Ms. Territo's testimony was indeed relevant to the LRE inquiry, but only with respect to the second of the *Rachel H.* factors. It had no bearing on the first factor, regarding the potential for educational/academic benefit.

#### ii. Jamaica Stevens

Katherine argues that the HO should have considered the testimony of Jamaica Stevens, Katherine's teacher at ABC for the summer of 2000. Katherine refers the Court to Ms. Stevens' observations of Katherine's participation in various activities in ABC. Ms. Stevens opined that Katherine was learning socially because she had friends and because the other children had accepted her and her problem-solving skills had improved.

The Court concludes that, as with Ms. Territo's testimony, Ms. Stevens' testimony is relevant to the non-academic benefits

available to Katherine from a full inclusion placement but not to the educational (academic) benefits; that is, it is relevant to the second *Rachel H.* factor but not to the first. As discussed above, the program in which Katherine was enrolled at ABC was not academic. Further, Ms. Stevens testified that the ABC summer program was even less academic than the ABC preschool program throughout the year. (RT Sept. 12, 2000 at 26:14–17.) Moreover, Ms. Stevens testified that she had no experience working with special education students and had taken only one, relatively superficial course on working with children with special needs. (*Id.* at 30:22–27.) Finally, when asked about Katherine's academic performance during the summer of 2000, Ms. Stevens replied, "I really can't say anything on that one. I know, I mean, I know that she can write her name.... And I know that she can follow directions when it comes to something like an art project or a cooking project. But I've never really done an academic project with her, so I can't." (*Id.* at 27:9–14, 18–21.) Accordingly, even though Ms. Stevens may have believed that children constantly learn through everyday experience, (*see id.* at 33:21–26), it is clear that Ms. Stevens' observations of Katherine and her opinions of Katherine are not relevant to the issue of whether Katherine would have benefitted academically from a full inclusion setting. Accordingly, Ms. Stevens' opinions are not entitled to any weight in the Court's consideration of the first *Rachel H.* factor, although they are relevant to the Court's consideration of the second *Rachel H.* factor.

### iii. *Patricia Toboni*

Katherine contends that the HO should have considered the testimony of Patricia Toboni, a private speech therapist retained by Katherine's family to provide her with speech and language therapy using the Links to Language program. Ms. Toboni was a licensed speech and language pathol-

ogist with a Masters degree in Communicative Disorders. Ms. Toboni had experience working with children with Pervasive Development Disorder. She worked with Katherine from May 2000 through the time of the due process hearing. She was familiar with both special day classes and regular education classes. Ms. Toboni opined that Katherine could gain academic benefits from a regular education placement because Katherine had demonstrated the cognitive and linguistic capacity to respond to structure, to respond to an organized presentation, and to learn new information. She made clear, however, that Katherine would require support services in the form of a team approach involving the teacher, the parents, a speech and language specialist, an occupational therapist, the school psychiatrist, and the use of strategies and modifications in the classroom. In its opposition brief and cross-motion, the District does not address Ms. Toboni's testimony regarding the potential that Katherine would receive educational benefits from placement in a full inclusion setting.

The Court finds that Ms. Toboni's testimony lends support to Katherine's contention that she would gain academic benefits from mainstreaming, but her opinions do not deserve significant weight in the Court's analysis. It is clear from her testimony that Ms. Toboni had substantial experience and expertise in speech and language therapy and that she spent a significant amount of time—ten one-hour sessions over three or four months, (RT Sept. 11, 2000 at 80:5–16)—working with Katherine. But while Katherine has thoroughly set out the substance of Ms. Toboni's testimony in her moving papers, she has provided *no argument*, either in her opening brief or her reply brief, as to why Ms. Toboni's opinions should be accorded substantial weight. The closest thing to argument that Katherine offers is her observa-

tion that Ms. Toboni and certain other witnesses "have all either worked with or personally observed Katie in the regular education setting." (Pl.'s Mot. at 16.) But not only does Katherine fail to explain the significance of this observation, she does not support it with any citation to the record, and therefore the Court will disregard it consistent with its warning in the Order Denying Motions Without Prejudice. Indeed, the evidence is to the contrary: Ms. Toboni testified that she never observed Katherine in a classroom setting, (RT Sept. 11, 2000 at 76:9–18, 102:21–23), or in any other structured or academic setting with other children, (*id.* at 83:16–20), including Bacich, (*id.* at 95:18–20), and that her work with Katherine was limited to individual sessions with Katherine's mother or father present, (*id.* at 80:26–81:5). The Court further notes that Ms. Toboni acknowledged that she did not speak to any of Katherine's teachers in her special day class nor even made any effort to do so. (*Id.* at 75:22–26.) When asked why she had not made any such effort, Ms. Toboni responded that she was setting out to "get to know Katie ... and her speech and language skills" and therefore did not feel it was of any use to speak with her teachers or others who worked knew her and worked with her. (*Id.* at 76:1–8.) The Court finds it surprising that Ms. Toboni would feel confident offering an opinion about whether Katherine would benefit from a full inclusion setting, albeit with support services and modifications, without consulting with others who had worked with Katherine, such as Ms. Yourman. Accordingly, while Ms. Toboni certainly has the expertise and experience in working with Katherine to offer opinions regarding the potential for Katherine's academic benefit in a full kindergarten setting, Katherine has not provided the Court with any reason why Ms. Toboni's opinions merit the attribution of significant weight to them.

#### iv. *Patty Reader–Harrison*

The final witness whose testimony that, according to Katherine, the HO should have considered was Patty Reader–Harrison. Ms. Reader–Harrison was the instructional aide that Katherine's family provided for her at Trinity. Ms. Reader–Harrison testified about Katherine's participation and performance in various activities at Trinity. She did not offer an explicit opinion about whether Katherine was gaining academic benefit at Trinity, but her testimony suggested that she believed that Katherine was integrating well into her classroom environment at Trinity.

The Court finds Ms. Reader–Harrison's testimony singularly unimpressive with regard to the issue of whether Katherine would receive educational benefits from a full inclusion placement. Ms. Reader–Harrison testified that she had worked with Katherine for just one month, and during that time there had been only one meeting of "support people" regarding Katherine. (RT Oct. 17, 2000 at 198:1–5.) In addition, when asked whether she had any sense as an aide whether the kindergarten class at Trinity was adhering to state standards for public schools, Ms. Reader–Harrison admitted that she did not know what the state standards were. (*Id.* at 189:11–13, 190:2–6.) This admission is particularly relevant given that there was testimony that the class at Trinity that Katherine attended was a sort of "junior" kindergarten, where many, if not most, of the students were four years old. (*Id.* at 188:22–189:1; RT Sept. 11, 2000 at 237:25–238:1.)

Based on the foregoing, the Court has great difficulty finding that Ms. Reader–Harrison was in a position to know whether Katherine would have obtained academic benefit from placement in a full-inclusion, public school setting. Ms. Reader–Harrison's discussion of her intervening

when Katherine becomes lost or distracted, (*see* RT Oct. 17, 2000 at 178:19–27), does not demonstrate that Katherine would in fact be gaining academic benefit from a full inclusion placement; it merely demonstrates that her occasional disruptive behavior can be controlled, (*see id.* ("[A]re there any *disruptive behaviors* that Katie engages in?" (Emphasis added.))). Ms. Reader–Harrison's function at Trinity appears to have been to keep Katherine focused on learning; there is no indication, however, that she had the experience or expertise to determine whether Katherine had made academic progress in the one month during which she had been working with her. The Court thus agrees with the District that "[g]iven the short amount of time that Ms. Reader–Harrison worked with Katherine, and given that she was not Katherine's teacher and had no knowledge of the state standards for kindergarten, her testimony failed to demonstrate that Katherine would receive meaningful educational benefit from full-time placement in a regular kindergarten program." (Defs.' Cross-mot. at 15.)

### c. *Court's Evaluation of Evidence and Conclusion*

As the foregoing discussion makes clear, the Court finds that the HO's evaluation of the testimony of the four witnesses whose testimony he expressly considered was cogent and convincing and supported by the evidence in the record. The Court thus makes the same findings and draws the same conclusions with respect to such testimony.

With regard to the testimony of the four witnesses whose testimony the HO failed to consider, the Court finds that only the testimony of Ms. Toboni deserves to be accorded any weight with regard to the Court's evaluation of the first *Rachel H.* factor, namely Katherine's potential for receiving educational benefit from a full-time placement in a regular classroom setting.

That weight, however, is not substantial. The testimony of Ms. Territo and Ms. Stevens is relevant to the Court's consideration of the second *Rachel H.* factor, namely Katherine's potential for receiving non-academic benefits from a full inclusion placement. And the testimony of Ms. Reader–Harrison is relevant only to the third *Rachel H.* factor, Katherine's potential effect on the teacher and classroom.

Accordingly, the Court makes the following findings with regard to the four factors comprising the *Rachel H.* analytical framework:

1. *Educational benefits from a full inclusion placement.* The Court finds that Katherine would not receive any educational (*i.e.,* academic) benefits from a full inclusion placement for the 2000–2001 school year. This finding is supported primarily by the testimony of Ms. Yourman and Dr. Patterson. Of the testimony not considered by the HO, only the testimony of Ms. Toboni has any weight in the Court's consideration of this factor. But for the reasons described more fully in Part A.2.b.iii of the Discussion section of this Order, *supra,* the Court does not accord Ms. Toboni's opinions much weight. Her testimony, along with all the other testimony presented in favor of Katherine's position, is insufficient to establish that it is more likely than not that Katherine would gain some educational benefit from a full inclusion placement.

2. *Non-educational benefits from a full inclusion placement.* The Court finds that Katherine would likely receive some non-educational benefits from a full inclusion placement for the 2000–2001 school year. This finding is supported primarily by the testimony of Ms. Territo and Ms. Stevens regarding Katherine's social interactions with other students at ABC.

3. *Effect of Katherine's presence on the teacher and other students in a regular*

*classroom.* The Court finds that Katherine's presence in a regular classroom would likely have minimal effect on the teacher and other students, provided that she had the support of a one-on-one aide who could help refocus her attention and prevent her from bothering other students when she became lost or distracted from the instruction by the teacher. This finding is supported primarily by the testimony of Ms. Reader–Harrison.

4. *Cost of mainstreaming Katherine in a regular classroom.* As the District conceded in the hearing below, (Dec. at 25 n. 26), the cost of mainstreaming Katherine would not be a factor.

The result of these findings is that the first factor weighs overwhelmingly against full mainstreaming; the second factor weighs somewhat in favor of full mainstreaming; and the third and fourth factors do not weigh significantly either way. In light of the Ninth Circuit's analysis in *Poolaw v. Bishop,* the Court concludes that its finding regarding the first factor effectively "trumps" its findings regarding the other three factors and compels it to conclude that a full inclusion placement would not result in Katherine's being provided an FAPE. *See* 67 F.3d 830, 836–37 (9th Cir.1995). The District thus fulfilled its responsibilities under the IDEA by offering Katherine an FAPE for the 2000–2001 school year. In reaching this conclusion, the HO was correct.

Accordingly, the Court DENIES Plaintiff's Motion and GRANTS Defendants' Cross-motion with respect to the portion of Katherine's claim relating to the 2000–2001 school year.

## B. *Defendants' Motion and Plaintiff's Cross-motion*

The District has moved for summary judgment on their counterclaim, which challenges the HO's determination that it failed to provide Katherine an FAPE for the 1999–2000 school year and the 2000 ESY. Katherine has cross-moved for summary judgment on the District's counterclaim. The Court addresses the parties' arguments in the most logical order.

### 1. *Arguments in Plaintiff's Cross-motion Unrelated to the Merits of the District's Counterclaim*

Katherine advances two potentially dispositive arguments regarding the viability of the District's counterclaim that do not concern the merits of the counterclaim. First, Katherine contends that the District's counterclaim is not timely under the applicable statute of limitations. Second, she contends that the District's counterclaim is moot.

### a. *Timeliness of District's Counterclaim*

■ Katherine contends, and the District does not dispute, that the applicable statute of limitations for IDEA claims in California is 90 days from receipt of the hearing officer's decision in a due process hearing. The HO's Decision was filed on January 5, 2001. Katherine timely filed her IDEA claim in this Court on April 4, 2001. Subsequently, the District filed its Counterclaim concurrently with its Answer on June 13, 2001—more than 90 days after the District's receipt of the HO's Decision.

Katherine contends that the District's counterclaim is barred as untimely. Katherine asserts that determination of the effective date of filing for purposes of calculation of the limitations period depends on the nature of the counterclaim. According to Katherine, "[t]he true test is whether a counterclaim is merely a recoupment action, similar to an affirmative defense, or whether it is an affirmative action, capable of sustaining life on its own": "where the plaintiff's claim is timely and the counterclaim is a compulsory claim seeking recoupment or a reduction or a defense to

the plaintiff's claim, the counterclaim relates back" to the date on which the plaintiff's claim was filed; but where "[e]ach party's claim could have been raised by itself and a ruling on each party's respective claim and counterclaim will have no bearing on the other party's claim", the counterclaim does not relate back. (Pl.'s Cross-mot. at 13–14.) Katherine maintains that the District's counterclaim is not a recoupment claim, but an affirmative claim that could have been asserted independently. This argument is apparently based on her contention that Katherine's claim and the District's counterclaim primarily concern different school years, and "[e]ach school year is a separate and distinct cause of action under the IDEA." (*Id.* at 14.) As for the one school term that is common between the claim and counterclaim, the 2000 ESY, Katherine contends that the District's counterclaim is still independent because the District is seeking an injunction that it be relieved from the HO's order regarding reimbursement and that, even though the District is seeking damages as well, it has not provided any legal authority that would permit the Court to order Katherine's parents to return monies paid to them by the District. (*Id.*)

The District disagrees that its counterclaim is untimely. It offers two arguments in response to Katherine's contentions. First, it asks the Court to apply the holding of *Kirkpatrick v. Lenoir County Board of Education,* 216 F.3d 380 (4th Cir.2000), in which the Fourth Circuit addressed a scenario materially identical to that presented here. The *Kirkpatrick* court concluded that the defendant school district's counterclaim, which, like the plaintiffs' claim, was an IDEA "appeal" of a state administrative decision, was a compulsory counterclaim. *Id.* at 387. Accordingly, the court held that the filing date of the district's counterclaim related back to the time of the original filing of the plaintiffs'

claim. *Id.* at 388. Second, the District argues that even if the Court declines to apply the holding of *Kirkpatrick* and instead adopts Katherine's theory of distinguishing between counterclaims that are recoupment claims and those that seek affirmative, independent relief, the Court should conclude that the District's counterclaim is one for recoupment. The District reasons that through its counterclaim it is seeking a reduction of Katherine's monetary claims regarding the 2000 ESY and her request for attorney's fees.

In *Kirkpatrick,* the parents of a disabled student in North Carolina filed suit in federal court under 20 U.S.C. § 1415 to appeal a state administrative law judge's decision regarding matters pertaining to the state's provision of an FAPE for her. *Id.* at 382. Under the applicable law, the limitations period for filing an appeal under § 1415 was 30 days from receipt of the administrative judge's decision. *Id.* The plaintiffs timely filed suit on the last day of the 30–day period. *Id.* The defendant board of education did not file an appeal within the 30–day period; instead, after receiving the plaintiffs' complaint, it filed a document entitled "Answer and Appeal" seeking a judgment denying the plaintiffs certain relief they were seeking. *Id.* The plaintiffs moved to dismiss the board's action as untimely filed. *Id.* The district court denied the motion, characterizing the board's "Answer and Appeal" as a compulsory counterclaim under Rule 13(a) of the Federal Rules of Civil Procedure that related back to date upon which the plaintiffs filed their original claim. *Id.* at 382–83. The district court then considered the merits of the claim and counterclaim. *Id.* at 383. The plaintiffs appealed. *Id.*

The Fourth Circuit Court of Appeals affirmed. The central issue the court addressed was "whether an action filed in federal district court pursuant to the

IDEA is an original civil action, for which a counterclaim would be permitted, or whether the action is more accurately characterized as an appeal, such that the other party would have to file an additional appeal within the prescribed period in order to preserve its claims." *Id.* The court reviewed the language of 20 U.S.C. § 1415(i)(2), legislative history of the IDEA, and case law and determined that an IDEA action filed in federal district court must be characterized as an original civil action and not as an appeal. *Id.* at 383–87. Having concluded that an IDEA action is an original civil action, the court considered whether the board's counterclaim was timely filed. *Id.* at 387. The court stated that because the board's counterclaim was an original civil action, the Federal Rules of Civil Procedure governed. *Id.* The court determined that the board's counterclaim was a compulsory counterclaim "because it arises from the same administrative hearing and review officer's decision, involves the same child and school district, and evokes consideration of the same law." *Id.* at 387–88. Since, under Fourth Circuit law, the filing of a compulsory counterclaim relates back to the time of the filing of the plaintiff's complaint, and because the plaintiffs' original IDEA claim was timely commenced, the court concluded that the board's counterclaim related back and was thus not barred by the statute of limitations. *Id.* at 388 (citing *Burlington Industries, Inc. v. Milliken & Co.*, 690 F.2d 380, 389 (4th Cir.1982)).

The Court agrees with the District that much of the reasoning and conclusions of *Kirkpatrick* is squarely on point and persuasive. It cannot be denied that the procedural facts of *Kirkpatrick* are materially identical to those in the instant case for purposes of the inquiry into whether the District's counterclaim was timely filed. Further, the Court agrees, and Katherine does not dispute, that the District's counterclaim under § 1415(i)(2) is an original civil action, rather than an appeal.

What prevents the Court from adopting the ultimate holding of *Kirkpatrick* is the Fourth Circuit's express invocation of *Fourth Circuit law*—and *only* Fourth Circuit law—holding that a compulsory counterclaim relates back to the time of the filing of the plaintiff's complaint. *See id.* Specifically, in support of that proposition the *Kirkpatrick* court cited to a 1982 Fourth Circuit case, *Burlington Industries, Inc. v. Milliken & Co.*, 690 F.2d 380 (4th Cir.1982). *Kirkpatrick*, 216 F.3d at 388. However, in its moving papers the District has not cited to any Ninth Circuit or Supreme Court analogue to *Burlington Industries*. Despite an exhaustive search, the Court has been unable to locate such an analogue or even a case that suggests that this holding is the rule in the Ninth Circuit. Accordingly, the Court declines to apply the holding of *Kirkpatrick* to resolve the issue of the timeliness of the District's counterclaim.

The Court must next consider the test urged by Katherine for resolving the timeliness issue: if the District's counterclaim is a recoupment action, it relates back, but if it is "an affirmative action, capable of sustaining life on its own," (Pl.'s Cross-mot. at 13), it does not. The District, for its part, denies that this is the "true test," but it asserts that its counterclaim is a recoupment action in any event.

The Court agrees with Katherine's argument, but only to a certain extent. Katherine is correct that federal common law applies to determine the relation back issue, as the District's counterclaim is based on federal law, namely the IDEA. *See Kirkpatrick*, 216 F.3d at 387–88 (applying federal law to determine whether defendant's IDEA claim related back to filing of plaintiff's claim). Katherine is also correct that as a general matter, counterclaims for

recoupment relate back to the date of filing of the plaintiff's complaint. *Reiter v. Cooper*, 507 U.S. 258, 263–64, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993); *Klemens v. Air Line Pilots Ass'n. Int'l*, 736 F.2d 491, 501 (9th Cir.1984). But Katherine is incorrect that the "true test" distinguishes between recoupment counterclaims that are defensive in nature and independent counterclaims seeking affirmative relief that are capable of sustaining life on their own. Tellingly, Katherine fails to cite to any authority in support of this proposition. To be sure, there is authority from outside the Ninth Circuit holding that a counterclaim that seeks separate relief for a wrong independent of the transaction and occurrence on which the plaintiff's claim is based does not relate back to the filing of the plaintiff's complaint. *E.g., Kadonsky v. United States*, 216 F.3d 499, 507 (5th Cir.2000); *Basham v. Finance Am. Corp.*, 583 F.2d 918, 927–28 & n. 18 (7th Cir. 1978). But the Court has located no authority supporting the assertion that the counterclaim does not relate back if it is an "affirmative action" and is "capable of sustaining life on its own." Indeed, as the Supreme Court has observed, one significant distinction between a counterclaim and a defense is that "[a] defense cannot possibly be adjudicated separately from the plaintiff's claim to which it applies; a counterclaim can be." *Reiter*, 507 U.S. at 265, 113 S.Ct. 1213. Accordingly, the most that can be gleaned from the authority cited by the parties herein is the principle that if the District's counterclaim *sounds in recoupment*, it relates back to the filing of Katherine's Complaint and is thus timely.

Logically, the next task is to determine whether the District's counterclaim is one for recoupment. The Supreme Court has not clearly defined the nature or elements of a claim for recoupment. It has characterized recoupment, when asserted in the form of an affirmative defense, as "a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded." *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 415, 118 S.Ct. 1408, 140 L.Ed.2d 566 (1998) (internal quotation marks and citations omitted). It has also characterized recoupment as "the setting off against asserted liability of a counterclaim arising out of the same transaction." *Reiter*, 507 U.S. at 264, 113 S.Ct. 1213. The Ninth Circuit does not appear to have defined recoupment in any published opinion, and the Circuits of the Court of Appeals that have expressly considered the issue have not forged a common definition. The Fourth Circuit has defined recoupment as "the right of the defendant to have the plaintiff's monetary claim reduced by reason of some claim the defendant has against the plaintiff arising out of the very contract giving rise to the plaintiff's claim." *First Nat'l Bank of Louisville v. Master Auto Serv. Corp.*, 693 F.2d 308, 310 n. 1 (4th Cir.1982). The Fifth Circuit has held that the elements of a recoupment claim are that (1) the claim arises out of the same transaction or occurrence which is the subject matter of the plaintiff's suit, (2) it seeks relief of the same kind or nature as that sought by the plaintiff's claim, and (3) it seeks an amount not in excess of that sought by the plaintiff's claim. *Frederick v. United States*, 386 F.2d 481, 488 (5th Cir.1967).[16] This definition has been adopted by the Tenth Circuit. *Fed. Deposit Ins. Corp. v. Hulsey*, 22 F.3d 1472, 1487 (10th Cir.1994) (citing *Frederick*, 386 F.2d at 488). The Sixth

---

16. The Fifth Circuit has also stated that when recoupment is asserted defensively as a counterclaim, the defendant must prove that (1) the plaintiff's and the defendant's claim arise from the same transaction, and (2) the plaintiff's action is timely. *Kadonsky v. United States*, 216 F.3d 499, 507 (5th Cir.2000).

Circuit has characterized recoupment as a right that "arises from the same transaction or contract that creates an asset . . . ." *Nat'l City Bank, Northwest v. Columbian Mut. Life Ins. Co.*, 282 F.3d 407, 409 (6th Cir.2002).

Since the Ninth Circuit has not defined the elements of a recoupment claim in federal common law and a consensus among the Circuits on that issue appears lacking, the Court's analysis relies on the more general pronouncements of the Supreme Court. In light of these pronouncements, the Court concludes that the District's claim sounds in recoupment. The relevant statements of the Supreme Court appear to suggest that whether a claim sounds in recoupment hinges on whether it arises out of the same *transaction* on which the plaintiff's claim is based. *Beach v. Ocwen Federal Bank*, 523 U.S. 410, 118 S.Ct. 1408, 140 L.Ed.2d 566 (1998); *Reiter*, 507 U.S. at 264, 113 S.Ct. 1213; *Rothensies v. Elec. Storage Battery Co.*, 329 U.S. 296, 299, 67 S.Ct. 271, 91 L.Ed. 296 (1946) ("The essence of the doctrine of recoupment . . . has never been thought to allow one transaction to be offset against another, but only to permit a transaction which is made subject of a suit by a plaintiff to be examined in all its aspects, and judgment to be rendered that does justice in view of the one transaction as a whole.").[17] Here, Katherine's claim and the District's counterclaim arise from the same transaction: the HO's Decision.[18] They also concern the same child and school district and evoke consideration of the same law. *See*

*Kirkpatrick*, 216 F.3d at 388. Accordingly, the Court concludes that the District's counterclaim arises from the same transaction as Katherine's claim, and therefore it sounds in recoupment.

Katherine's arguments that her claim and the District's counterclaim do not arise from the same transaction are unavailing. Katherine cites to no authority in support of her contention that each school year is a separate and distinct cause of action under the IDEA. (Pl.'s Cross-mot. at 14.) The mere fact that the IDEA and related California law require an IEP to be developed for each student on an annual basis, (*id.*), does not obviate the fact that the transaction that gave rise to both Katherine's claim and the District's counterclaim is the same: the HO's Decision. Moreover, 20 U.S.C. § 1415(i)(2) provides a right of action for a party who is "aggrieved by the findings and decision" made under certain subsections of § 1415. Thus, a prerequisite to commencing an action under § 1415(i)(2) is that findings or a decision be rendered in a due process hearing, and it is such findings or decision that may be appealed through assertion of the right of action provided in § 1415(i)(2).

Katherine's citation to a case from the District of Delaware, *Nalley v. McClements*, 295 F.Supp. 1357 (D.Del.1969), does not advance her contention that the District's counterclaim seeks relief on an independent wrong. The claims in *Nalley* were based on state law, not federal law. *See id.* at 1359 (noting that the court had

---

17. This standard may appear to be functionally identical to that employed by the Fourth Circuit, which turns on whether the counterclaim is compulsory or permissive under Federal Rule of Civil Procedure 13. *Kirkpatrick v. Lenoir County Board of Education*, 216 F.3d 380, 388 (4th Cir.2000). There is, however, a slight distinction: to be compulsory, the counterclaim must not only arise out of the same transaction or occurrence that is the

subject matter of the plaintiff's claim, but also "not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction." Fed.R.Civ.P. 13(a).

18. The Court uses the term "transaction" in a broader sense than the contractual context to include transactions that could reasonably be termed "occurrences."

diversity jurisdiction over the parties' claims). Accordingly, the court applied, *inter alia,* Delaware state law (including authority from federal cases applying Delaware law) to determine whether the counterclaim sounded in recoupment. *See id.* In contrast, the District's counterclaim is based on federal law; state law, let alone Delaware state law, does not apply. But even if such law did apply, *Nalley* is distinguishable on its facts. After examining the facts before it, the *Nalley* court concluded that the defendants were not seeking recovery of monies they had previously paid to the plaintiffs. *Id.* at 1360. In contrast, the District is seeking, *inter alia,* to recoup its payment of costs to Katherine's parents for the 2000 ESY.

The District's counterclaim, therefore, sounds in recoupment. As such, it relates back to the commencement of Katherine's suit. Katherine's limitations challenge to the District's counterclaim must fail.

### b. *Mootness of District's Counterclaim*

 Katherine contends that, regardless of the limitations issue, the District's Counterclaim is moot because the District already reimbursed her parents for certain expenses incurred for the 2000 ESY. She argues that "[t]here is no legal authority presented for the principle that under the IDEA a parent can be ordered to pay monies to the local education agency." (Pl.'s Cross-mot. at 16–17.) The District responds by arguing, *inter alia,* that 34

C.F.R. § 300.512(b)(3) authorizes the Court to grant whatever relief the Court determines to be appropriate.

The Court agrees with the District. The District's Counterclaim alleges that "Katherine G. is not entitled to one-half tuition or transportation reimbursement as ordered in the SEHO decision." (Counterclaim ¶ 19.) The District prays for, *inter alia,* "any costs, fees, and damages to which District is entitled by law and which court deems reasonable," as well as "all other and further relief as the court deems just and appropriate." (*Id.,* Prayer for Relief ¶¶ 5–6.) Essentially, the District is asking for relief of, among other things, restitution for its payment of certain costs incurred by Katherine's parents for the 2000 ESY as ordered by the HO. Aside from 34 C.F.R. § 300.512(b)(3), 20 U.S.C. § 1415(i)(2)(B)(iii) authorizes the Court to grant such relief as the Court determines to be appropriate. There is no reason to conclude that the Court may not provide such relief. Accordingly, the District's counterclaim is not moot.[19]

### 2. *Arguments in Defendants' Motion and Plaintiff's Cross-motion Relating to Merits of District's Counterclaim*

In moving for summary judgment on its counterclaim, the District contends that the HO erred in two respects in concluding that Katherine was denied an FAPE for the 1999–2000 school year and the 2000

---

**19.** The Court notes that Katherine in her cross-motion asks the Court for the opportunity to present supplemental briefing on the issue of mootness if the District presents facts or argument on that issue. (Pl.'s Cross-mot. at 17.) Evidently, Katherine has overlooked the Court's express provision of an opportunity for her to file a reply to the District's opposition to her cross-motion (which is also the District's reply to her opposition to Defendants' Motion) in the Order Denying Motions Without Prejudice. (Order Denying Mots.

Without Prejudice at 7 ("Plaintiff may file a reply, if any, to the District's opposition to plaintiff's Rule 56(b) cross-motion for summary judgment on the District's counterclaim ... no later than *March 4, 2003* ...." (Emphasis in original.))). She has not availed herself of that opportunity by filing a reply on her cross-motion. The Court will not reward her failure to read its Orders thoroughly by ordering supplemental briefing on this point, particularly given that her argument is meritless from the outset.

ESY. First, the District argues that the HO's finding that the District committed a "procedural" violation of the IDEA by failing to discuss adequately mainstreaming opportunities with Katherine's parents at the May 1999 IEP meeting is not supported by law or by the facts in the record. Second, the District argues that the evidence refutes the HO's finding that the District committed a "substantive" violation of the IDEA by failing to offer Katherine an FAPE. The District contends that its arguments apply equally with respect to the 1999–2000 school year and to the 2000 ESY.

Katherine does not present any arguments regarding the merits of the District's counterclaim that concern matters independent of those touched on by the District's arguments in Defendants' Motion.[20] Accordingly, the Court addresses the District's arguments in turn, weighing them against Katherine's arguments in response and the Court's independent assessment of the evidence in the record.

### a. District's Alleged "Procedural" Violation of IDEA

■ At the hearing, Katherine alleged that the District committed five procedural violations that led to the loss of educational opportunity for her during the 1999–2000 school year: (1) failure to provide updated annual goals; (2) use of prewritten IEP objectives; (3) failure to report progress toward goals and objectives; (4) failure to discuss goals and objectives at an IEP meeting; and (5) failure to discuss mainstreaming at the May 1999 IEP meeting. The HO considered the arguments and evidence and concluded that with regard to

the first four alleged procedural violations, one of them did not actually occur, and the three that did occur did not result in loss of educational opportunity for Katherine. (Dec. at 16–17.) He therefore concluded that none of the first four alleged procedural violations resulted in the denial of an FAPE.

With regard to the fifth alleged procedural violation, the HO evidently took for granted that, as Katherine argued, the District was required by the IDEA to adequately discuss mainstreaming opportunities with Katherine's parents at the May 1999 IEP, although the HO did not cite to any authority in support of this principle. (Dec. at 17.) The HO considered the evidence presented on this point. He stated that Cynthia G. testified that mainstreaming was not discussed at the meeting; instead, Ms. Yourman simply concluded that Katherine was not yet ready for a regular education environment. (*Id.*) The HO also observed that the IEP for the 1999–2000 school year did not reflect that the four members of the IEP considered whether or not Katherine should be mainstreamed. (*Id.*) Based on "the weight of the evidence, including the deficient IEP and [Cynthia G.'s] undisputed testimony," the HO found that the District did not adequately discuss mainstreaming opportunities at the May 1999 IEP meeting. (*Id.*) The HO went on to find that the District's failure to do so resulted in actual loss of educational opportunity in two respects: "Katherine was never placed by the District in an environment with age-appropriate, typically developing peers"; and the IEP developed for Katherine omitted a component (which

---

**20.** The District has filed Defendants' Objections to Purported Evidentiary Citations in Plaintiff's Opposition to Defendants' Motion for Summary Judgment (the "Objections to Plaintiff's Opposition to Defendants' Motion"). The text of the Objections to Plaintiff's Opposition to Defendants' Motion is a virtual carbon-copy of the text of the Objections to Plaintiff's Motion. For the reasons set forth in the Court's discussion of the Objections to Plaintiff's Motion, *see supra note* 14, the Court OVERRULES the Objections to Plaintiff's Opposition to Defendants' Motion.

should have been included in addition to the special education component) "containing opportunities to interact with typically developing peers in order to implement Katherine's goals and objectives with respect to pragmatics and social skills." (*Id.*) Given these findings, the HO concluded that the District's "procedural" violation of the IDEA resulted in deprivation of an FAPE for Katherine for the 1999–2000 school year. (*Id.*) For "identical reasons," the HO concluded that this violation deprived Katherine of an FAPE for the 2000 ESY. (*Id.* at 24.)

In Defendants' Motion the District argues that the HO's finding of a procedural violation of the IDEA was not supported by law or by fact. With regard to the law, the District contends that the IDEA does not require school districts to "adequately discuss mainstreaming" with the parents of a disabled child at an IEP meeting. (Defs.' Mot. at 19.) Instead, the District contends, as provided in 20 U.S.C. § 1414(d)(1)(A)(iv), the IDEA requires only that the IEP include "an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class." (*Id.*) According to the District, "[t]his requirement was clearly met; there was no evidence or argument to the contrary." (*Id.*) With regard to the facts, the District asserts that the evidence in the record, including the testimony of Cynthia G., "clearly establishes that at the May 1999 IEP team meeting there *was* discussion about a regular edu-

cation preschool for Katherine for the 1999–2000 school year." (*Id.* (emphasis in original).) The District adds that the May 11, 1999, IEP document "clearly indicates that the team considered the reasons for service delivery outside the regular education classroom." (*Id.*)

In Plaintiff's Cross-motion, Katherine does not cite to any authority in support of the HO's conclusion that the District was obligated by the IDEA to adequately discuss mainstreaming opportunities with Katherine's parents. Indeed, Katherine does not even address this issue in any respect in her brief.[21]

The Court has undertaken extensive research to determine whether any authority supports the principle that the IDEA requires adequate discussion of mainstreaming opportunities with the parents of a disabled child at an IEP meeting. The Court has located no such authority, and it agrees with the District that 20 U.S.C. § 1414(d)(1)(A)(iv) does not support the proposition that school districts are obligated to adequately discuss mainstreaming with the parents of a disabled child at IEP meetings. Because neither the HO in his Decision nor Katherine in her brief have directed the Court's attention to any such authority, and because the Court has not been able to locate such authority through its own efforts, the Court concludes that the aforesaid principle has no basis in law. While it may seem intuitive that school districts should engage in such discussion at IEP meetings, the Court is not willing

---

**21.** In Katherine's Closing Brief in the proceedings below, which has been reproduced and included as part of the record in this action, the only legal authority she cited in support of her assertion below that the IDEA requires discussion of mainstreaming opportunities at every IEP meeting was 34 C.F.R. § 300.347(a)(4). (RT Student's Closing Br. at 30.) She did not provide any quotation from or discussion of this regulation, however. Perhaps such omission is not surprising, be-

cause as the HO observed in his Decision, this regulation was inapplicable to the 1999–2000 school year because it was not effective in California until October 1999, after Katherine's program for the 1999–2000 school year had already begun. (Dec. at 17 n. 16.) At any rate, the language of 34 C.F.R. § 300.347(a)(4) is substantively identical to that of 20 U.S.C. § 1414(d)(1)(A)(iv). Accordingly, 34 C.F.R. § 300.347(a)(4) does not provide any support for the HO's conclusion.

to read into the statute an obligation that is not expressly stated or otherwise interpreted by controlling authority to exist.

Accordingly, the Court concludes that the HO's conclusion regarding the District's purported obligation to adequately discuss mainstreaming with Katherine's parents at the May 1999 IEP meeting has no basis in law. Consequently, there is no need to address whether the conclusion has any basis in fact. The result is that the HO's conclusion that Katherine was denied an FAPE for the 1999–2000 school year and 2000 ESY is entitled to no deference to the extent that it rests on the alleged "procedural" violation discussed above.

### b. District's Alleged "Substantive" Violation of the IDEA

■ The HO also concluded that the District's placement of Katherine was "substantively" inappropriate, resulting in denial of an FAPE for Katherine for the 1999–2000 school year and 2000 ESY. The HO applied the four-prong test for substantive appropriateness discussed in Part A.1.a of this section, *supra:* an appropriate placement must (1) be designed to meet the student's unique needs; (2) be reasonably calculated to provide him or her with some educational benefit; (3) comport with his or her IEP; and (4) be provided in the least restrictive environment. The HO concluded that the District's placement of Katherine was not designed to meet Katherine's unique needs in the areas of pragmatics and social skills because an appropriate program would have provided her opportunities for mainstreaming with typically developing peers. (Dec. at 19.) [22] Nor was the placement reasonably calculated to provide Katherine with some educational benefit, the HO concluded, because it did not include opportunities to interact with typically developing peers where Katherine's pragmatic and social skills goals and objectives could be implemented. (*Id.* at 22.) By the same token, the HO stated, the District's program failed to comport with Katherine's IEP because it did not implement her pragmatic and social skills objectives in an environment with typically developing peers. (*Id.* at 23.) Finally, the HO concluded that "the weight of the evidence" demonstrated that Katherine should have been mainstreamed with typically developing peers, and because she did not have such opportunities, Katherine's program for the 1999–2000 school year was not provided in the least restrictive environment. (*Id.*)

The District argues that the evidence in the record does not support the HO's conclusions. Beginning with the issue of whether the District's program was designed to address Katherine's unique needs, the District points out that the HO made four findings. (Defs.' Mot. at 20.) The first of these findings was that the placement in Ms. Yourman's special day class was not designed to meet Katherine's unique needs in the areas of pragmatics and social skills, and that to meet those needs, an appropriate program for Katherine must have also provided her mainstreaming opportunities with typically developing peers. (*Id.*) The District contends that, contrary to the HO's perception of the evidence, the District provided persuasive testimony establishing that Katherine's 1999–2000 program offered substantial opportunities for Katherine to improve her social skills and pragmatics with typically developing peers. (*Id.*) In particular, the District notes that Ms. Yourman testified that more than three quarters of the students in her special day

---

**22.** The HO concluded, however, that an appropriate placement need not have included one-to-one speech and language therapy, a one-on-one aide, or consulting services. (*Id.* at 21–22.)

class were typically developing in terms of their social skills, and Ms. Trahan testified that there were typically developing children in Ms. Yourman's class who were appropriate social and language models for Katherine. (*Id.* at 20–21.)

The District has accurately characterized this first finding of the HO in connection with his analysis of whether the District's 1999–2000 program was designed to address Katherine's unique needs. (Dec. at 19.) As the District also accurately suggests, the HO's reasoning behind this finding is opaque. The HO stated:

> Katherine's pragmatics and social skills goals and objectives require participation in a placement with typically developing peers. The District did not provide persuasive testimony that its program offered these opportunities. Moreover, no such opportunities were even available at the Marindale site. The evidence established that there were no nondisabled, typically developing peers at Marindale. Therefore, the District was unable to implement the goals and objectives of Katherine's IEP in the SDC.

(*Id.*) As best the Court can discern, it appears that the HO at some point made the inferential step that "participation in a placement with typically developing peers" for purposes of addressing Katherine's pragmatics and social skills goals and objectives *necessarily required* mainstreaming or some other placement with nondisabled peers. But the HO did not indicate what evidence provided the basis for making that inferential step. Indeed, the HO provided not a single evidentiary citation or reference to evidence in support of the statements set forth above. Katherine, for her part, has not even addressed in her briefing the District's arguments regarding this first finding of the HO, so the Court does not have the benefit of any insight she might have.

Given the utter failure of the HO to explain the evidentiary basis or reasoning behind the finding above, given that the District has cited to two portions of testimony indicating that Katherine was in fact placed with typically developing peers in Ms. Yourman's special day class, (*see* RT Aug. 31, 2000 at 62:27–64:9 (testimony of Ms. Trahan), 210:24–26 (testimony of Ms. Yourman)), and given that Katherine has presented no argument whatever in response to the District's challenge to the validity of this finding, the Court concludes that this finding was unsupported by evidence and thus erroneous. It is simply not self-evident that Katherine's placement in a special day class where many, if not most, of her peers were typically developing in terms of their social setting and were arguably appropriate social and language models, without more, was insufficient to address Katherine's unique needs in the areas of pragmatics and social skills. Perhaps the HO had good reason to conclude that such placement was insufficient, but without any explanation of that reason and the evidence underlying it, the Court cannot determine what it was. The Court is not under any obligation to mine the record for evidence supporting the HO's findings; to the contrary, the Court is to conduct *de novo* review, showing deference where the HO's reasoning is thorough and sound and addressing the arguments presented by the parties. Where, as here, the only arguments and evidence presented to the Court weigh in favor of the District's position that Ms. Yourman's special day class was, by itself, adequate to address Katherine's special needs in the areas of social skills and pragmatics, the Court shall adopt that position.

The second finding assailed by the District was that Katherine's IEP for the 1999–2000 school year did not reflect that the IEP team adequately considered mainstreaming opportunities. (Defs.' Mot. at

21.) The District argues that this finding is refuted by the evidence, namely the testimony of Cynthia G. and by the IEP document dated May 11, 1999. (*Id.*)

The Court need not consider whether the evidence in the record supports or refutes this finding because the finding is clearly irrelevant to the inquiry of whether the District's placement was designed to address Katherine's unique needs. The HO rested this finding on the proposition that the IDEA required that Katherine's placement be with nondisabled peers, citing the LRE provision of the IDEA, 20 U.S.C. § 1412(a)(5)(A), and a regulation making the LRE provision applicable to preschool-age children, 34 C.F.R. § 300.552. (Dec.: at 19–20.) In so doing, the HO effectively grafted the LRE requirement of the IDEA onto the separate and independent requirement that a school district's program be designed to address the disabled child's unique needs. Tellingly, the HO failed to cite to any authority in support of the validity of this analytical step. Yet careful review of relevant authorities indicates that the LRE inquiry is distinct from the "design" inquiry. *See, e.g., Capistrano Unified Sch. Dist. v. Wartenberg,* 59 F.3d 884, 896–87 (9th Cir.1995) (analyzing issue of whether parents' placement of student in private school, upon disagreement with school district's proposed placement of student, was designed to address his unique needs independently of issue of whether placement satisfied least restrictive alternative requirement of IDEA). This practice is not surprising: there seems to be little sense in creating a redundant inquiry regarding the least restrict alternative if that issue is considered both in the "design" inquiry and the LRE inquiry. Accordingly, the Court concludes that as a matter of law this second finding of the HO was irrelevant to the "design" inquiry to which it was supposed to relate.

The third finding addressed by the District was that Katherine was enrolled by her parents in a regular preschool (which also served as day care) and made significant progress during the 1999–2000 school year. (Defs.' Mot. at 21.) Although the District does not question the accuracy of this finding, the District assails the HO's inference that it was "likely true that Katherine's gains in [the areas of pragmatics and social skills] were a result of Katherine's daycare program at ABC Academy, where she interacted with nondisabled peers." (*Id.* (quoting Dec. at 20 n. 23).) Specifically, the District points out that both Ms. Territo and Ms. Stevens had little to no experience working with special education students and were unaware of any special learning needs Katherine might have. (*See id.*) The District concludes by arguing that

[g]iven the undisputed evidence concerning the nature and severity of Katherine's needs, it defies logic for the hearing officer to conclude that it was "likely" that Katherine's progress was in some part attributable to her participation in day care, where her interaction with peers was supervised by a staff with little or no training in working with children with special needs and with little or no understanding of Katherine's unique needs.

(*Id.* at 21–22.) Thus, the crux of the District's criticism of the validity of this finding is that it was illogical for the HO to find that it was likely that Katherine's progress was in some part attributable to her enrollment at ABC because the staff supervising her at ABC were insufficiently trained and insufficiently knowledgeable of her unique needs.

The Court finds the District's argument unpersuasive and the HO's finding both reasonable and worthy of credence. The implicit premise underlying the District's

argument is that it is impossible for a disabled student to obtain benefits in the areas of pragmatics and social skills when placed in a setting such as ABC if the staff have little or no training in working with children with special needs and have little or no understanding of the student's unique needs. The District has cited to no evidence or authority in support of this premise, and the Court cannot discern why it otherwise would be correct. To the contrary, it seems intuitive that a disabled student such as Katherine would gain substantial benefit purely from her interaction with nondisabled students in a day care setting, irrespective of the specific training or experience of the staff supervising her. This intuitive inference finds support in the testimony of Ms. Territo and Ms. Stevens. Ms. Stevens opined that Katherine was learning socially from her participation at ABC because the other children stopped treating her differently and because she started endeavoring to solve problems on her own. (RT Sept. 12, 2000 at 31:14–32:11.) And Ms. Territo testified that the program that Katherine attended at ABC offered "free play time," during which children learned to interact in group situations. (RT Sept. 25, 2000 at 30:15–23.) Although, as the HO observed, it is certainly likely that Katherine's progress in the areas of pragmatics and social skills during the 1999–2000 school year was at least partially attributable to Ms. Yourman's work with her, it seems implausible that Katherine's participation in the group settings with nondisabled students at ABC, where such group settings were oriented towards students' learning social skills and problem-solving on their own, did not have some appreciable benefit to her learning in those areas. The alleged deficiencies in training, credentials, or experience of the ABC staff would not seem to prevent Katherine's achieving these gains. Accordingly, the Court concludes that the HO properly found that Kath-erine's enrollment in ABC provided her with gains in the areas of pragmatics and social skills.

The fourth and final finding called into question by the District was that the District's proposed placement for Katherine for the 2000–2001 school year was "nearly identical" to Katherine's actual program for the 1999–2000 school year. (Defs.' Mot. at 22.) The HO evidently considered this fact to be an implicit admission on the part of the District that Katherine's 1999–2000 school year placement should have included a mainstreaming component. (See Dec. at 20–21.) The District contends that its proposed placement of Katherine for the 2000–2001 school year had several significant differences from Katherine's actual placement for the 1999–2000 school year: Katherine's proposed teacher in the general education kindergarten class at Bacich was an experienced and qualified teacher, in contrast to Katherine's instructor at ABC; the District's offer for 2000–2001 included significant services to facilitate Katherine's transition into the general education afternoon kindergarten; and the proposed 2000–2001 placement contemplated consultation sessions between Ms. Yourman and Katherine's teachers both in her regular education class and in her special day class. (Defs.' Mot. at 22.)

The District's arguments are straw men. To be sure, as a general matter the HO's finding that the District's proposed placement for Katherine for the 2000–2001 school year was "nearly identical" to Katherine's actual program for the 1999–2000 school year is somewhat of an overstatement. But with respect to the one feature that is relevant to the instant inquiry, namely the provision of a mainstreaming component for purposes of improving, among other things, Katherine's pragmatics and social skills, they were indeed nearly identical: both provided opportunities

for Katherine's social interaction with non-disabled typically developing peers. Naturally it would be expected that the District's proposed 2000–2001 school year placement would be more sophisticated, given that Katherine was entering kindergarten for the 2000–2001 school year rather than preschool. Moreover, had the District included a mainstreaming component in its proposed program for Katherine for the 1999–2000, it is certainly possible that there would have been ancillary support services and programs as well. But since the District refused to include a mainstreaming component and Katherine's parents made the unilateral decision to enroll Katherine in ABC, there was no provision for such support services and programs in 1999–2000. The Court sees no reason to conclude that the absence of such support services and programs in 1999–2000 renders it impossible to draw any comparisons between the District's proposed placement of Katherine for the 2000–2001 school year and the District's actual placement of her for the 1999–2000 school year. The Court thus agrees with the HO's implicit conclusion that the inclusion of a mainstreaming component at Bacich in Katherine's proposed placement for the 2000–2001 school year indicates that the District recognized the value of a mainstreaming component for these purposes.

In sum, the Court either rejects or disregards the HO's first two findings underlying his conclusion that an appropriate program for the 1999–2000 school year should have included interaction with typically developing peers by which her pragmatics and social skills goals and objectives could have been implemented, but the Court adopts the HO's latter two findings. In light of these findings, the Court concludes that the District's placement of Katherine for the 1999–2000 school year was not designed to address her unique needs in the areas of pragmatics and social skills. Because placement that is designed to address a disabled student's unique needs is a necessary element of an FAPE, *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley*, 458 U.S. 176, 188–89, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), the Court concludes that the District failed to provide Katherine with an FAPE for the 1999–2000 school year. For the same reasons, the Court concludes that the District failed to provide Katherine with an FAPE for the 2000 ESY. Having reached these conclusions, the Court need not and does not address the District's challenges to the HO's other findings and conclusion regarding the 1999–2000 school year and the 2000 ESY.[23]

Accordingly, the Court DENIES Defendants' Motion and GRANTS Plaintiff's Cross-motion.

### CONCLUSION

For the reasons stated above,

IT IS HEREBY ORDERED THAT:

1. Defendants' Objections to Purported Evidentiary Citations in Plaintiff's Motion for Summary Judgment [Docket No. 79] are OVERRULED;

---

23. In the context of these other findings, the District has filed Defendants' Request for Judicial Notice in Support of Motion for Summary Judgment on Their Counterclaim (Rule 56(a), F.R.C.P.) (the "Request"), in which the District asks the Court to take judicial notice of several unpublished IDEA decisions. The Court GRANTS the Request. But because the Court need not and does not reach the HO's findings pertaining to matters other than whether the District's placement of Katherine for the 1999–2000 school year was designed to address her unique needs, the Court does not consider the matter sought to be noticed in the Request.

2. Plaintiff's Motion for Summary Judgment [Docket No. 68] is DENIED;

3. Defendants' Cross-motion for Summary Judgment on Plaintiff's Claim [Docket No. 80] is GRANTED;

4. The Court *sua sponte* enters summary judgment in favor of Defendants on Plaintiff's claim to the extent it addresses Defendants' proposed placement of Katherine for the 2001 extended school year;

5. Defendants' Objections to Purported Evidentiary Citations in Plaintiff's Opposition to Defendants' Motion for Summary Judgment [Docket No. 83] are OVERRULED;

6. Defendants' Request for Judicial Notice in Support of Motion for Summary Judgment on Their Counterclaim (Rule 56(a), F.R.C.P.) [Docket No. 73] is GRANTED;

7. Defendants' Motion for Summary Judgment on Their Counterclaim [Docket No. 72] is DENIED; and

8. Plaintiff's Cross-motion for Summary Judgment [Docket No. 76] is GRANTED.

IT IS FURTHER ORDERED THAT the Clerk shall enter judgment in favor of Defendants on Plaintiff's claim and in favor of Plaintiff on Defendants' counterclaim, with each party to bear its own costs. The Clerk shall close the file and terminate any pending matters.

IT IS SO ORDERED.